[Civ. No. 16227. Second Dist., Div. Three. June 2, 1948.]

TRANS-OCEANIC OIL CORPORATION (a Corporation), Appellant, v. CITY OF SANTA BARBARA et al., Respondents.

778

Griffith & Thornburgh, Yale B. Griffith, C. Douglas Smith, O'Melveny & Myers, Louis W. Myers, Jackson W. Chance, Sidney H. Wall and Rodney K. Potter for Appellant.

Henry T. Bailey, City Attorney, for Respondents.

VALLÉE, J. pro tem.—Trans-Oceanic Oil Corporation petitioned the Superior Court of San Barbara County for a writ of mandate to compel the city of Santa Barbara, and its mayor and the members of its city council to annul and rescind their action in revoking a permit for the drilling of an oil well within the city of Santa Barbara, previously issued to it, and to reinstate such permit. A trial was had before the court sitting, without a jury. Findings were in favor of defendants. From a judgment entered thereon, Trans-Oceanic Oil Corporation appeals.

The facts are not in dispute. On July 8, 1938, appellant's predecessor acquired an oil lease of what is known as the "Low Tract" for a period of 10 years "and so long thereafter as oil and gas is produced in the leased premises in paying quantities." That portion of the "Low Tract" covered by the lease is a rectangular shaped plot or tract of approximately 80 acres: A reference to the maps, introduced as exhibits, indicates that it is located in the southwest section of the city

of Santa Barbara. It is bounded on the east by Punta Verde, a small tract subdivided into five short blocks, on the west by a large tract of unsubdivided land, on the south by the Pacific Ocean, and on the north by Cliff Drive. The property immediately north of the leased premises abutting Cliff Drive consists of a large area more than a mile in length, which has never been subdivided, excepting two small subdivided areas—the La Vista Del Oceana and Rogers Tracts. The unsubdivided area is used exclusively for farming and oil drilling. At the time the original lease was made, there were two oil wells located on the "Low Tract," oil operations having been commenced by others in 1934. After the lease was assigned to it, appellant proceeded to drill and complete seven wells in the tract, four of which produced oil. Three wells were producing oil at the time of the trial.

Thereafter, appellant applied to the city council for a permit to drill an additional well to be known as No. 8. With its application appellant deposited a cash "spud-in" fee of $500 and a surety bond in the sum of $500 to assure the removal of the derrick in the event of abandonment of the well.

Ordinance No. 1613 of the city of Santa Barbara, which governed the issuance of drilling permits then in force, provided for a hearing by the council on each application for such a permit, and provided further: "If the City Council shall find that the granting of such permit will not materially affect the health or safety of persons residing or working in the neighborhood thereof or elsewhere in the City and will not be materially detrimental to the public welfare or injurious to property or improvements in the neighborhood thereof or elsewhere in the City in which the property of the applicant is situated, it shall grant such permit; otherwise it shall deny the same. The action of the Council in granting or denying such permit shall be final and conclusive." The ordinance contained no provision for the revocation of such permit.

On July 9, 1941, permit No. 1218 was granted and issued by the council to appellant to drill well No. 8 for oil or gas. It fixed no time as to when the work was to be commenced or as to when the work was to be finished, its concluding sentence reading: "This license terminates . . . ." The blank space was never filled in.

At the time the permit for the drilling of well No. 8 was issued, ordinance No. 1493 (the Comprehensive Zoning Ordinance of Santa Barbara) divided the city into six districts. One of these districts was designated "R-OD" or "One

Family Residence and Oil Drilling," and drilling for and production of oil was permitted in that district. (Ord. 1493, § 17.) The "Low Tract," except the northeast 250 feet thereof, was a part of and included in Zone "R-OD." The exhibits show that the "R-OD" zone projects outward from the rest of the city like a triangular peninsula.

Promptly upon receipt of the permit, appellant commenced preparatory work for drilling a deep well. At a cost of approximately $4,500 it constructed substantial concrete foundations for a derrick, erected an oil derrick, dug a sump hole, erected a power house, moved boilers into place, and laid necessary pipe lines to the site. Before actual drilling of the well was commenced, war was declared by the United States on December 8, 1941. About February 24, 1942, the United States Army took possession of the entire coastal area of the "Low Tract," including the site of well No. 8 and all of the land in its immediate vicinity. Thereafter, no further drilling operations were permitted. Long range artillery was installed on the premises by the Army. Subsequently, the Army removed the guy wires and certain other supports from the derrick, as a result of which, in an unusual windstorm about December 9, 1943, the derrick was blown down and destroyed. There remained, however, the concrete foundations, the power house, the timbers from the derrick, the pipe lines, the boilers and the sump hole. The Army retained exclusive possession of the premises until January 18, 1945, when they were turned over by the government to the owner and to appellant as lessee.

On March 7, 1946, the City Council of Santa Barbara adopted ordinances Nos. 2069 and 2070, amending sections 2 and 17, respectively, of ordinance No. 1493 (the Comprehensive Zoning Ordinance) making unlawful oil drilling throughout the entire city of Santa Barbara except in industrial zones. Ordinance No. 2069 amended section 2 of ordinance No. 1493 by dividing the city into five districts instead of the former six districts, and converting what was formerly the "R-OD" district into "R-1" or "One Family Residence District." Ordinance No. 2070 repealed section 17 of ordinance No. 1493 which had created district "R-OD" or "One Family Residence and Oil Drilling." After the passage of these amendments to the zoning ordinance, the city took no action to revoke appellant's permit until April 9, 1947. Appellant continued to operate its wells on the "Low Tract," and other wells on adjacent property continued "to operate and to be maintained

and produced as a non-conforming use and still so continue."

At the time the property was turned over to appellant by the government on January 18, 1945, appellant was unable to proceed with drilling operations on well No. 8 due to the shortage of labor, materials and drilling equipment; and it was not until 1947 that resumption of drilling activities became possible. In March, 1947, appellant contracted for the drilling of well No. 8 and work was resumed on March 31, 1947. It consisted of the laying of a 2½ inch water pipe line a distance of 2,600 feet to the well site and the redigging and enlarging of the sump. On April 7, 1947, the contractors moved about 300 tons of drilling machinery and equipment to the location, set up a 126-foot portable steel drilling mast, and had a large crew of men at work for the purpose of "spudding" in well No. 8. The agreed contract price for the moving of this equipment to and from the property was $5,600 and the agreed "standby" cost for maintaining the equipment and crew was $360 a day, which was reduced to $193 a day after the purported revocation of appellant's permit.

On April 9, 1947, the city council, at a special meeting, without any notice to appellant and without a hearing, by resolution revoked appellant's permit to drill well No. 8 on the ground that appellant had not proceeded "to drill said well in accordance with the time element provision of its application, and for the reason that the drilling of a new oil well within the City of Santa Barbara, California, is now in violation of City Zoning Ordinance 1493." On the same day, appellant was notified of the council's action and informed that the $500 "spud-in" fee paid for the permit would be returned to it upon presentation of a claim. Thereafter the building inspector refused to issue the usual and ordinary permits in connection with the work to be done on well No. 8 and the work was stopped. The bond which appellant filed is still in force and the $500 "spud-in" fee is still retained by the city.

Well No. 8 is located near the southwest corner of the "Low Tract," and it is conceded, and found by the court, that "there are no residences or structures of any kind upon . . . or within 1400 feet of the location of the well on any other property except for several oil wells to the north and east and west of said well . . . and said well . . . is located in an area used exclusively for farming and oil drilling."

In addition to the foregoing facts, the court also found that the revocation of the permit issued to appellant in 1941, did not deprive appellant of its property without due process of law; that the city council had not acted "arbitrarily"; that appellant had no vested right in the permit; that it was barred from drilling well No. 8 because (a) it had not drilled prior to the enactment of ordinances No. 2069 and 2070 amending zoning ordinance No. 1493, (b) the permit was lawfully revoked "pursuant to the Resolution of April 9, 1947," (c) the drilling of the well would be violative of ordinance No. 1493, as amended by ordinances No. 2069 and 2070, and (d) "under the terms and provisions of said Zoning Ordinance, as amended, the drilling of said well would not be an enlarged and extended use of the premises belonging to petitioner and therefore in violation of said Zoning Ordinance as amended."

In a written "Memorandum of Opinion," the trial judge stated that he could find neither the act nor the intent necessary to effect an abandonment of the well in view of the fact that appellant had no access to the property for drilling purposes during the Army's occupation thereof and in view of the fact that after the return of the property to appellant there was an acute shortage of labor, materials and drilling equipment. He also stated that since the permit was silent upon the question of how soon appellant was required to commence drilling operations, it had a reasonable period of time within which to proceed and that under "all of the attending facts and circumstances, the Court finds that the Petitioner did proceed within a reasonable time."

The question involved is stated by appellant as follows: "May a city council lawfully revoke a permit for the drilling of an oil well, which was regularly and validy issued and was accepted and paid for by the permittee, in a case where (a) the attempt to revoke is not made until after the permittee has made substantial expenditures, done substantial work and incurred large additional liabilities in preparing to drill pursuant to the permit and in good faith reliance thereon; (b) where the purported revocation is based upon a subsequently enacted zoning ordinance restricting to residential uses property which is in the midst of a producing oil field and entirely surrounded by commercial uses, and (c) where the permit is purportedly revoked without any notice or hearing and without any finding that conditions have so changed as to make

the drilling of the well detrimental to public health, safety or morals?''

Appellant contends that when a valid permit has been duly and regularly issued and the permittee, relying thereon in good faith, has made substantial expenditures ·or incurred liability in substantial amounts in commencing to proceed pursuant to its terms, such permit ripens into a vested property right which may not be taken from him against his will other than by proceedings in eminent domain 'with the payment of just compensation (unless that which he does or proposes to do under the permit amounts to a nuisance, which has not been claimed by the city in the instant case). It was stipulated at the trial that there was no issue in the case as to well No. 8 constituting a nuisance.

■ It is fundamental in the law of real property situated within the limits of cities that the owner thereof may erect any structure thereon or use the same for any lawful purpose that he may see fit, subject only to such restrictions and regulations as the municipality may, in the exercise of the police power, by proper enactment, reasonably impose. (9 Am.Jur., § 3, p. 199; 3 McQuillin, Municipal Corporations (rev. ed.), § 1016, p. 350.) Confined within the proper limits of the police power such restrictions and regulations do not violate the rights of the individual. (12 Cal.Jur. 10-Yr.Supp. 139; 9 Am.Jur. § 3, p. 199; 3 McQuillin, Municipal Corporations (rev. ed.), § 1017, p. 354; 9 Cal.L.Rev. 164, ·12 Cal.L.Rev. 428, 13 Cal.L.Rev. 417.) Legislation requiring that a permit be issued by a municipality as a condition precedent to the erection of a structure on property privately owned, or to the use that may be made of such property, if reasonable, is a valid exercise of the police power (*City of Yuba City* v. *Cherniavsky,* 117 Cal.App. 568, 572 [4 P.2d 299]; 43 C.J. § 373, p. 345.)

■ It is not, nor could it be, claimed that a city council exercises unlimited discretion in the matter of revoking permits. A permit having issued, the power of a municipality to revoke it is limited. If the permittee does nothing beyond obtaining the permit or fails to comply with reasonable terms or conditions expressed in the permit granted, the proper authorities may revoke it. (*Vincent Pet. Corp.* v. *Culver City,* 43 Cal.App.2d 511 [111 P.2d 433]; *In re New York Electric Lines Co.,* 201 N.Y. 321, 334 [94 N.E. 1056]; ·*Godson* v. *Town of Surfside,* 150 Fla. 615 [8 So.2d 497]; *People* v. *Bales,* 224 App.Div. 87, ·88 [229 N.Y.S. 550, ·551], aff'd

250 N.Y. 598 [166 N.E. 339].) If a permittee has acquired a vested property right under a permit, the permit cannot be revoked. The principle is stated in 9 American Jurisprudence, section 8, page 204: "By the weight of authority, a municipal building permit or license may not arbitrarily be revoked by municipal authorities, particularly where, on the faith of it, the owner has incurred material expense. Such a permit has been declared to be more than a mere license revocable at the will of the licensor. When, in reliance thereon, work upon the building is actually commenced and liabilities are incurred for work and material, the owner acquires a vested property right to the protection of which he is entitled."

*Pelham View Apartments* v. *Switzer,* 130 Misc. 545 [224 N.Y.S. 56], is a leading case where the principle was applied. There a building permit had been issued for the erection of an apartment house and the petitioner had borrowed money, bought property, prepared plans and begun construction by excavating a celler in reliance on the permit. Thereafter, a new zoning law was enacted, and the permit was revoked. In a proceeding in mandamus, it was held (p. 58 [224 N.Y.S.]) : "It was beyond the power of the common council to enact an ordinance to invalidate the permit issued and acted upon. It was likewise beyond the jurisdiction of the building inspector to revoke such permit, basing his revocation upon a subsequently enacted ordinance.

"Where a permit to build a building has been acted upon, and where the owner has, as in this instance, proceeded to incur obligations and to in good faith proceed to erect the building, such rights are then vested property rights, protected by the federal and state Constitutions. *City of Buffalo* v. *Chadeayne,* 134 N.Y. 163, 31 N.E. 443. The courts in such cases have uniformly applied the remedy of mandamus to cancel the revocation and to reinstate the permit. [Citations.] . . . It would be nothing short of confiscation, and a complete disregard of constitutional rights, if a municipality could revoke a building permit issued under the conditions as presented in this case."

*City of Buffalo* v. *Chadeayne,* 134 N.Y. 163 [31 N.E. 443], cited in the Pelham case, was an action to recover a penalty for violation of an ordinance. The council had granted the defendant a permit to erect seven frame houses. The defendant then entered into a contract for the materials, made excavations for the cellars and laid a portion of the

walls. Without notice to him the council rescinded the permit. Defendant continued construction. Hence the suit. The court held (p. 443 [31 N.E.]): ''The defendant's buildings are within the fire limits, as prescribed by the ordinance. He therefore had no right to construct them without the permission of the common council. Such permission, as we have seen, was granted on the 11th day of July, 1887, and thereby he acquired the right to proceed with the construction of his buildings, and to possess and enjoy the comforts they might afford. As soon as he had entered upon the construction of the buildings, and incurred liabilities for the work and material, he had a property interest in them. In this right he was entitled to protection. [Citations.] . . . If the common council could interfere and rescind its permit after a building is partially constructed, it could also rescind after it was fully completed. It would consequently follow that every person who in the past has constructed wooden buildings with the permission of the common council is now liable to have his permit revoked, and his buildings declared a nuisance, and abated as such.''

In *Village of Attica* v. *Day*, 134 Misc. 882 [236 N.Y.S. 607], a permit was issued authorizing the erection and maintenance of gasoline storage tanks with a capacity of 20,000 gallons. The permittees then obtained the right to erect a switch track along the side of their property, expended $800 for a tank and $200 for concrete foundations. The track was laid. The permittee contributed to the expense. Upon authority of *City of Buffalo* v. *Chadeayne, supra*, it was held that an attempted revocation of the permit was void.

The court, in *City of Little Falls* v. *Fisk*, 24 N.Y.S.2d 460, stated the principle thus (p. 470): ''If the owner of real property, having obtained a permit to construct a certain building, has entered upon the actual construction of the building and incurred liabilities for work and material prior to the adoption of a zoning ordinance, he cannot be restrained from continuing and completing the work. The adoption of the ordinance does not ipso facto revoke his permit. Furthermore, if he has received such a permit and has actually begun building operations, the revocation of his permit because of some amendment to the zoning ordinance or a change of mind of the official who issued it will not prevent the completion of the work. The courts readily grant such a person a peremptory mandamus order commanding the official to cancel his revocation of the permit and directing the re-

issuance thereof. In either case such a person, after entering in good faith upon the construction of a building, acquires a vested right of which he cannot be deprived. [Citations.]'' (See, also, *People* v. *Kleinert,* 201 App.Div. 751 [195 N.Y.S. 711, 714].)

The Supreme Court of Pennsylvania in *Herskovits* v. *Irwin,* 299 Pa. 155 [149 A. 195], quoted with approval from *Pelham View Apartments* v. *Switzer, supra,* 130 Misc. 545 [224 N.Y.S. 56, 58], and stated (p. 197 [149 A.]) : ''. . . we follow the rule stated in *City of Buffalo* v. *Chadeayne,* 134 N.Y. 163, 165, 31 N.E. 443, that a property interest arises where, after permit granted, a landowner begins construction of a building and incurs liability for future work. See, also, *Fuller* v. *Schwab,* 124 Misc. Rep. 659, 208 N.Y.S. 289, 290 ; *State* v. *Wisconsin Tel. Co.,* 181 Wis. 519, 195 N.W 544.''

The permittee in *Sandenburgh* v. *Michigamme Oil Co.,* 249 Mich. 372 [228 N.W. 707], on May 25, 1928, was granted a permit to construct a gasoline filling station. He immediately removed the concrete steps of a dwelling house on the property, took up a private walk and started excavation of the building walls. The next day, May 26, 1928, at noon, the permit was revoked. Two months later the City Council of Ann Arbor, by a zoning ordinance, placed the premises in a residential district. The Supreme Court of Michigan held the revocation ineffective, saying (p. 708 [228 N.W.]) : ''The permit was issued in true accord with the zoning ordinance then in force, and, if substantial work was commenced and performed thereunder, the city was precluded from revoking the permit and later amending the ordinance with reference solely to this property and have it accorded retroactive effect. We think the work commenced toward the construction of the building, the purchase of material and accessories, and the sums expended for labor brings the case within the exception noted in *City of Lansing* v. *Dawley,* 247 Mich. 394, 225 N.W. 500. . . . Under the zoning ordinance and the regular permit issued, defendant did not proceed and expend money at the peril of revocation of the permit and change of right by subsequent amendment to the zoning ordinance.''

The facts in *State* v. *Wisconsin Tel. Co.,* 181 Wis. 519 [195 N.W. 544], were these : Prior to 1917, the Wisconsin Telephone Company acquired lands in Milwaukee for the purpose of housing its central office and such additional units as might from time to time become necessary in its business, and with a view to erecting a building thereon. It caused to be de-

signed a building 225 feet in height, consisting of 16 stories and a basement. It obtained a building permit from the city of Milwaukee. It proceeded to erect eight stories of the building, placing a temporary roof above the ninth floor and postponing completion until the extension of its business required it. In 1923, the company decided to complete the building to a height of 13 stories, or 185 feet, and expended large amounts for engineering and architect fees, and contracted for materials. After these expenditures and the incurring of these liabilities, and in 1923, the Legislature of Wisconsin enacted a statute limiting the height of buildings in cities of the first class, which included Milwaukee, to 125 feet. In an action to test the validity of the statute as applied to the telephone company building, it was held that the statute should not be given retroactive effect, that to do so would work "a serious invasion of vested rights" and that it did not apply to that building. (See, also, *Wasilewski* v. *Biedrzycki*, 180 Wis. 633 [192 N.W. 989].)

In *Dobbins* v. *Los Angeles*, 195 U.S. 223 [25 S.Ct. 18, 49 L.Ed. 169], the facts were these: In August, 1901, the City Council of Los Angeles adopted an ordinance fixing the limits within which gas works might be erected. On November 22, 1901, plaintiff was granted a permit to erect a gas works in an area not covered by the ordinance. She then, by contract, constructed foundations at a cost of upwards of $2,500. On November 25, 1901, the city council amended the ordinance to include the location of plaintiff's works within the prohibited territory. The court said that (p. 176 [49 L.Ed.]) "[b]eing the owner of the land, and having partially erected the works, the plaintiff in error had acquired property rights, and was entitled to protection against unconstitutional encroachments which would have the effect to deprive her of her property without due process of law."

Other decisions applying the principle are: *City of Evansville Ind.* v. *Caseteria*, 7 Cir., 51 F.2d 232, 237; *District of Columbia* v. *Cahill*, 54 F.2d 453, 60 App.D.C. 342; *Pratt* v. *Denver*, 72 Colo. 51 [209 P. 508; 509]; *Williams* v. *Smith*, 77 Colo. 572 [238 P. 40]; *Crow* v. *Board of Adjustment of Iowa City*, 227 Iowa 324 [288 N.W. 145, 147]; *Incorporated Town of Spencer* v. *Andrew*, 82 Iowa 14 [47 N.W. 1007, 1008, 12 L.R.A. 115]; *Inspector of Buildings* v. *Nelson*, 257 Mass. 346 [153 N.E. 798, 800]; *General Baking Co.* v. *Board of Street Commissioners*, 242 Mass. 194, 197 [136 N.E. 245]; *Lerch* v. *City of Duluth*, 88 Minn. 295 [92 N.W. 1116, 1117];

*Atlantic Broadcasting Co.* v. *Wayne Tp.*, 109 N.J.L. 442 [162 A. 631, 632; *Willis* v. *Town of Woodruff*, 200 S.C. 266, 272 [20 S.E.2d 699, 701]; *Brown* v. *Grant* (Tex.Civ.App.), 2 S.W.2d 285, 287; *Gulf Refining Co.* v. *City of Dallas* (Tex. Civ.App.), 10 S.W.2d 151, 155, 156; *State* v. *City of Spokane*, 64 Wash. 388, 394 [116 P. 878]; *Wickstrom* v. *Laramie*, 37 Wyo. 389 [262 P. 22, 23]. See, 43 C.J. § 380, p. 349.)

The underlying principle of the cases from other jurisdictions to which we have referred, was applied in *Jones* v. *City of Los Angeles*, 211 Cal. 304 [295 P. 14]. In that case the facts were these: In March, 1927, Los Angeles annexed the territory known as the Mar Vista District. At the time of annexation there were already in operation in the district four sanitariums for the treatment of nervous diseases. On August 11, 1927, some months after the annexation of the Mar Vista District, the City Council of Los Angeles adopted a zoning ordinance by which the Mar Vista District was excluded from the area in which the establishment and maintenance of such sanitariums was permitted. This ordinance was enacted independently of the general zoning plan of the city and its restrictive provisions were directed toward only one type of business. The action was brought by the owners of the institutions seeking to enjoin enforcement of the ordinance. The Supreme Court held that the ordinance was valid insofar as it prohibited the further establishment of businesses of this type in the restricted districts and that it was invalid in its application to the plaintiffs. The court quoted at length with approval from *Pelham View Apartments, Inc.* v. *Switzer, supra*, 130 Misc. 545 [224 N.Y.S. 56]. In the course of the opinion it was said (p. 321): "Our conclusion is that where, as here, a retroactive ordinance causes substantial injury and the prohibited business is not a nuisance, the ordinance is to that extent an unreasonable and unjustifiable exercise of police power." (See, also, *People* v. *Bales, supra*, 224 App.Div. 87 [229 N.Y.S. 550], aff'd 250 N.Y. 598 [166 N.E. 339]; *Smith* v. *City Council of Marlborough*, 302 Mass. 571 [20 N.E.2d 408]; *Rosenberg* v. *Whitefish Bay*, 199 Wis. 214 [225 N.W. 838]; *Hauser* v. *State*, 113 Ohio St. 662 [150 N.E. 42]; Bassett, Zoning, 112-116; 39 Yale L.J. 735, where the cases are collected.)

The instant case is not to be confused with cases dealing with the power of a municipality to prohibit or regulate the conduct of activities or businesses which are in the nature of nuisances. (*Jones* v. *City of Los Angeles*, 211 Cal. 304,

316 [295 P. 14]; *People* v. *Hawley,* 207 Cal. 395 [279 P. 136];
*Jardine* v. *City of Pasadena,* 199 Cal. 64 [248 P. 225, 48
A.L.R. 509]; *Curtis* v. *City of Los Angeles,* 172 Cal. 230 [156
P. 462]; *In re Throop,* 169 Cal. 93 [145 P. 1029]; *In re Smith,*
143 Cal. 368 [77 P. 180].) The trial court, in its opinion,
stated that since the respondent had not urged this ground,
it was not "at issue" before the court. Respondent does not
urge that ground here on appeal. There is no element of
nuisance involved.

In issuing the permit, respondents determined that the
drilling of well No. 8 would not be materially detrimental to
the health or safety of persons residing or working in the
immediate vicinity of the well, or injurious to property or
improvements in the neighborhod thereof, or elsewhere in the
city. ■ The revocation of a permit to drill for and ex-
tract oil in a proven oil field affects the inherent value of the
natural resource which can be utilized only from the land
itself. Ordinarily, action of municipal bodies against the
conduct of a certain line of business within a defined area does
not destroy the business for it may be carried on within a
district designated for that purpose. Land values in the
restricted area may thus be affected, but generally such
values are not inherent but in the nature of unearned incre-
ments. The owner of a property right to drill for and ex-
tract oil in a proven field acquired under a permit, may not
constitutionally be deprived thereof without payment of just
compensation except upon a showing that its exercise con-
stitutes a nuisance.

■ In reliance upon the permit, appellant in good faith,
promptly commenced preparatory work for drilling, con-
structed concrete foundations, erected a power house, dug a
sump hole, laid pipe lines, moved 'boilers into place and
erected a derrick at a cost of approximately $4,500. In so
doing, appellant acquired a vested property right to proceed
under the permit to drill well No. 8, and if oil were found to
extract it. Was that right lost because the war and sub-
sequent inability to obtain labor, materials, and drilling
equipment, consequent upon the war, intervened to make it
impossible to conduct drilling operations until 1947? We
think not. There is no express finding as to whether appel-
lant did or did not proceed under the permit within a reason-
able time. However, the court found: that appellant's
operations were interrupted by the war; consequent dis-
ruption of all business and financing plans; occupation of the

790

area by the Army; installation of artillery; destruction of the derrick during the Army's occupation without fault on appellant's part. The trial judge, in his written opinion, which is a part of the clerk's transcript, said: "Whether this [abandonment] has taken place must be determined from the evidence, that is to say, do the acts and intent of the petitioner indicate abandonment? This question must be answered, in the court's opinion, in the negative. Petitioner prepared to drill in October, 1941, by erecting a derrick and shortly thereafter the government took over the premises for war purposes, and the petitioner had no access to the property for drilling purposes. The premises were not returned to the petitioner herein until January 18th, 1945, and the court finds that because of the shortage of labor, materials and drilling equipment, the *petitioner was unable to proceed on M'divani No. 8 at any substantial time sooner than it did.* From these facts, the court can find neither the act nor the intent necessary to effect an abandonment. . . . The license or permit . . . is itself the permission and contains the conditions with which the petitioner must comply in order to lawfully drill. As set forth above, the permit is silent upon the question of how soon the petitioner must act and under these circumstances, the petitioner then had a reasonable period of time within which to proceed. *Under all of the attending facts and circumstances, the court finds that the petitioner did proceed within a reasonable time."* (Italics added.) ▆▆ The Rules on Appeal provide for incorporation of the written opinion of the trial judge in the record. (Rules on Appeal, rule 5(a), 22 Cal.2d 4.) We may consider the opinion of the trial judge for the purpose of understanding and interpreting the findings. (*Noble* v. *Kertz & Sons Feed etc. Co.*, 72 Cal.App.2d 153, 158 [164 P.2d 257].) Obviously, that is one of the purposes of the provision enabling a party to an appeal to place the written opinion of the trial judge before the reviewing court, a practice which was merely tolerated prior to the adoption of the Rules on Appeal in 1943. ▆▆ Interpreting the findings in the light of the opinion, it appears that appellant did not at any time intend to abandon and did not, in fact, abandon its rights under the permit, and that it proceeded within a reasonable time. The uncontradicted evidence is to that effect. Respondent has not referred us to any law, and we have found none, which says that a vested right is divested because the owner of the right is prevented from exercising it by circumstances over which

he has no control. The permit was a warrant to do something not forbidden by law. (2 Bouv. Law Dict., Rawle's Third Rev., p. 2569.) It was a warrant to appellant to drill well No. 8 and to produce oil therefrom. It did not fix the time within which the well should be drilled or placed on production. Appellant had a reasonable time within which to do so. (43 C.J. § 381, p. 350.) As appellant proceeded within a reasonable time its right was not lost by abandonment.

The next question for determination is the effect of the amendments to the zoning ordinance adopted in 1946, on the right which had vested in appellant prior to their enactment. The amendments purported to change the area in which a number of producing oil wells existed and in which well No. 8 was to be drilled, from "One Family Residence and Oil Drilling" district to "One Family Residence" district.

The authorities, to which reference has been made, hold that where a permit has been duly and regularly issued and rights have vested thereunder, the adoption of a zoning ordinance prohibiting the permitted use of the property does not *ipso facto* revoke the permit. The amendments may not be given retroactive effect. The trial judge in his memorandum opinion said that "there is nothing in the City Ordinance as amended attempting to give it any retroactive effect." In *London* v. *Robinson*, 94 Cal.App. 774 [271 P. 921], a permit was issued to erect a building under an ordinance permitting the erection of the building contemplated on a particular site in an area designated "second residential district." After a contract was entered into for erection of the building, but before construction was begun, the ordinance was amended to make the area in which the site was located a "first residential district," thus prohibiting construction of the building in the district. In holding that the permittee was within his rights in proceeding to erect the building after the amendment and that his rights had not been lost, the court quoted from 43 Corpus Juris 344, as follows (p. 777): " 'Zoning regulations ordinarily have no retroactive effect unless the authorizing legislation specifically so states. By force of statute or ordinance zoning regulations may not have the effect of revoking permits for buildings granted prior to their adoption.' " *Jones* v. *City of Los Angeles, supra,* 211 Cal. 304, definitely held that ordinarily a zoning ordinance "operates to limit the future use of property" and that (p. 319) "If the city desires to abolish

the nonconforming use, this may be a legitimate object of the police power, but the means of its exercise must not include the destruction of the property interest without compensation." (To the same effect: *Wilkins* v. *City of San Bernardino*, 29 Cal.2d 332, 340 [175 P.2d 542]; *Acker* v. *Baldwin*, 18 Cal.2d 341, 346 [115 P.2d 455], in which it was stated that: "Zoning regulations looks to the future, not to the past, and cannot be made retroactive." *Biscay* v. *City of Burlingame*, 127 Cal.App. 213, 220 [15 P.2d 784]. See, 26 Cal. L.Rev. 204; Anno. 117 A.L.R. 1119, 1136.) The rule to be applied in determining the effect of the amendments is stated in *McCann* v. *Jordan*, 218 Cal. 577, 580 [24 P.2d 457]: "It is well settled that the new ordinance may operate retroactively to require a denial of the application, or the nullification of a permit already issued, provided that the applicant has not already engaged in substantial building *or* incurred expenses in connection therewith. (*Brougher* v. *Board of Public Works*, 205 Cal. 426 [271 P. 487]; *Wheat* v. *Barrett*, 210 Cal. 193 [290 P. 1033]; *Brett* v. *Building Com. of Brookline*, 250 Mass. 73 [145 N.E. 269].)" (Italics added.)

The zoning ordinance at the time the permit was issued provided: Section 22: "The lawful use of land existing at the time this ordinance takes effect, although such use does not conform to the provisions hereof, may be continued, but if such non-conforming use is abandoned any future use of said land shall be in conformity with the provisions of this ordinance. . . ." Section 25: "(a) Nothing herein contained shall require any change in the plans, construction or designated use of a building for which a building permit has heretofore been issued and upon which actual construction has begun." (Ord. 1493, §§ 22, 25.) These provisions were a part of the ordinance as amended in 1946. The ordinance, as amended, did not affect existing nonconforming uses although such uses did not conform to the amendments. It appears that it was the clear intent of the ordinance, as amended, not to affect or divest rights which had vested prior thereto and not to affect or revoke previously existing permits when actual construction had begun. The amendments did not revoke appellant's permit or affect its right thereunder.

Respondents assert that *Marblehead Land Co.* v. *City of Los Angeles*, 9 Cir., 47 F.2d 528, *Vincent Pet. Corp.* v. *Culver City*, 43 Cal.App.2d 511 [111 P.2d 433], and *Sunny Slope Water Co.* v. *City of Pasadena*, 1 Cal.2d 87 [33 P.2d 672],

compel affirmance of the judgment. Neither one of these decisions is analogous in its facts to the factual situation presented here.

In the Marblehead case, at a time when vacant land situate seven miles from the heart of Los Angeles was not restricted as to use, Standard Oil Company acquired a lease of the land to drill for oil and, at considerable expense, erected a derrick. An ordinance was then enacted placing the land in a residence zone. Suit was brought to enjoin enforcement of the ordinance. An injunction was denied. No permit of any kind had been granted or acted upon. In that case the appellant was about to drill in an area of vacant land where the possibility of finding oil was purely speculative. Three wells had been drilled in the neighborhood, each to a depth of 4,000 feet, without finding oil. In the present case the permit gave appellant a right to drill for and extract oil in a proven producing oil field. The area in which the well was to be drilled in the Marblehead case was partially surrounded by residential developments. Here the site where the well was to be drilled was surrounded by producing oil wells with no structures other than oil derricks and oil producing equipment within more than a quarter of a mile of the site. It was definitely determined in that case that the drilling of the well would constitute a nuisance. In the case at bar it is conceded that the drilling of the well and the extraction of oil will not constitute a nuisance. The following statement in *Brougher* v. *Board of Public Works,* 205 Cal. 426, 434 [271 P. 487], is expressive of the distinction between the Marblehead case and the instant case: "The exception noted in the foregoing authorities that a permit would not be revoked in those cases where the licensee 'had done something under the license from which the mere privilege would ripen into a vested right,' does not exist in those cases like the one before us, *where no permit has ever been issued.* In such cases there is no opportunity for any privilege to ripen into a vested right, for the reason that *no privilege, in the sense used in the authorities cited, is acquired until a permit has been issued.*" (Italics added.) As to the action of the city in including the leased land in a residence zone, the writer of the Marblehead opinion, without the citation of any authority therefor whatsoever, said (p. 534) : "It has uniformly been held that there is no vested right in a permit or an ordinance of the nature of that involved here, by which the boundaries of the residential zone

were changed to exclude appellants' property therefrom.''
This statement clearly means that there is no vested right in
a permit which has not been acted upon. No permit had
been granted, issued, or acted upon in that case. If the
statement means that it has been uniformly held that a per-
mittee cannot acquire vested rights in a permit which will be
protected against a later change in zoning, it is an incorrect
statement of the law. As we have seen, the great weight of
authority is to the effect that when rights have vested under
a permit they cannot be constitutionally divested by a mere
change of zone. As there was no permit involved in the
Marblehead case, the quoted statement is *obiter dictum* and
cannot have any application in a case where the permittee has
''engaged in substantial building or incurred expenses in
connection therewith'' in reliance upon a permit duly and
regularly issued. (*McCann* v. *Jordan,* 218 Cal. 577, 580
[24 P.2d 457].)

*Sunny Slope Water Co.* v. *City of Pasadena, supra,* 1 Cal.
2d 87, is not remotely in point on the question of whether
rights have vested under a regularly issued permit, or on the
question of whether a permit may be revoked where rights
have vested under it. In that case, application had been made
for a permit to drill a water well with a steam engine, boiler
and well rig. The request for the permit was denied. An
ordinance in force at the time prohibited the installation or
operation of a steam boiler without a permit. No permit was
ever issued. There is no analogy between a case where a per-
mit is applied for but not granted prior to a zoning restriction
and the present case where a permit was granted and acted
upon before zoning restrictions.

*Vincent Pet. Corp.* v. *Culver City, supra,* 43 Cal.App.2d
511, was an action for an injunction. The lower court had
granted a motion for judgment on the pleadings. The judg-
ment was affirmed. The sole question presented was whether
the complaint stated a cause of action. The complaint alleged
that the plaintiff on November 3, 1930, obtained a permit to
drill an oil well in an area where drilling for oil was permitted.
Apparently the permit limited the time within which the well
should be placed on commercial production. The city granted
various extensions of the permit, the last one up to May 30,
1937, subject to the condition that the well be placed on com-
mercial production before that date. About May 24, 1937,
the city council, after notice and hearing, adopted a resolu-
tion revoking the permit. The resolution, attached to the com-

plaint as an exhibit, recited that drilling operations had been suspended for long periods of time without excuse, that the promoters had many times definitely agreed with the city that operations would be completed within a time certain and had not complied with their agreements, and that the promoters had not shown whether or not oil could be produced in paying quantities. These recitations were not denied in the complaint. It was held that the complaint did not state a cause of action because (1) an "injunction lies to prevent threatened injury and has no application to wrongs which have been completed"; (2) the action "of the council was at least *quasi* judicial. The sole method of review would be by *certiorari* or *mandamus*"; (3) there was no allegation that the findings of fact of the council set forth in the revocatory resolution were not supported by the evidence; (4) there was no allegation that the revocatory ordinance was invalid or void, nor any facts alleged showing that the city acted unreasonably, illegally, arbitrarily or fraudulently. The permit, unlike that in the present case, was limited as to time and contained an express condition which had been breached by the permittee. The permittee was not doing any work on the well at the time of revocation and was relying upon a further extension. The court held that "under the permit secured by the plaintiff, it secured no right of property or of contract in a constitutional sense." There is broad language in the opinion relative to the power of a city to revoke a permit, which was not necessary to the decision of the case. That language must be construed as it applied to the facts in that case, i. e., a permit issued upon a condition and failure to comply with the condition. It cannot be given the broad application which respondent seeks to give it. (*People* v. *McAllister*, 15 Cal.2d 519, 523 [102 P.2d 1072]; *Hills* v. *Superior Court*, 207 Cal. 666, 670 [279 P. 805, 65 A.L.R. 266].)

A permit may not be revoked arbitrarily "without cause." (53 C.J.S. § 44, p. 651.) It is conceded that in revoking the permit granted to appellant, the City Council of Santa Barbara did so without prior notice to appellant, without a hearing, and without evidence. ▮ In determining that a permit, validly issued, should be revoked, the governing body of a municipality acts in a quasi-judicial capacity. In revoking a permit lawfully granted, due process requires that it act only upon notice to the permittee, upon a hearing, and upon evidence substantially supporting a finding of revocation.

In *Angelopulos* v. *Bottorff*, 76 Cal.App. 621 [245 P. 447], the plaintiff had been granted a license by the city of Sacramento to conduct a restaurant business at a designated location. Without notice to the licensee or opportunity for him to be heard, the city council revoked the license. The court held (p. 625): "There appears to be some conflict in the authorities relating to the power of the city council to revoke a license without notice, apparently due to the fact that the distinction has not been kept clearly in mind between a right to do business and a privilege to engage in certain occupations, usually attended by acts inimical to the public welfare, such as the keeping of saloons. But whatever the rule is in other states, it is now well settled in California that the fundamental right to engage in a business or occupation otherwise lawful and not inimical to the public welfare is different from occupations considered as a mere privilege and is surrounded with certain constitutional safeguards, among which is the right to be heard and the further fact that this right cannot be taken away except by due process of law. These matters are clearly set forth in the case of *Abrams* v. *Daugherty*, 60 Cal.App. 297 [212 P. 942]: 'The fourteenth amendment to the constitution of the United States provides that no person shall be deprived of life, liberty, or property, without due process of law. Article I, Section 1, of the constitution of California, provides that all men have certain inalienable rights, among them being those of enjoying liberty and possessing and protecting property, and section 13 thereof provides that no person shall be deprived of life, liberty, or property, without due process of law. The deprivation of such right without due process of law would be a violation of these provisions. The meaning of this is that no one can be deprived thereof without notice and an opportunity for a hearing before some tribunal authorized to determine the question. . . .' We do not think it necessary to cite authorities that the right to conduct a restaurant business is a property right, as contradistinguished from occupations or businesses permitted to be conducted or engaged in as a mere privilege, and that the deprivation or interference or prevention of one's engaging in the business of conducting a restaurant is a deprivation of a property right, and that all the cases of this state holding that such property rights cannot be taken away except by due process of law are applicable." In *Walker* v. *City of San Gabriel*, 20 Cal.2d 879 [129 P.2d 349, 142 A.L.R. 1383], the Supreme Court said (p. 881): "It

is well settled that a board commits an abuse of discretion when it revokes a license to conduct a legitimate business without competent evidence establishing just cause for revocation, and that hearsay evidence alone is insufficient to support the revocation of such a license. . . . There must be substantial evidence to support such a board's ruling, and hearsay, unless specially permitted by statute, is not competent evidence to that end. [Citations.]'' The petitioner in *Irvine* v. *State Board of Equalization*, 40 Cal.App.2d 280 [104 P.2d 847], had been granted a license by the board authorizing him to sell alcoholic beverages at a restaurant. Without notice or hearing, the license was revoked. The court held (p. 284) : ''We are not unmindful of the rule that there is no inherent right in a citizen to sell intoxicants; that a license so to do is not a proprietary right within the meaning of the due process clause of the Constitution (Const., art. I, sec. 13) ; that such license is not a contract, but as characterized in *State Board of Equalization* v. *Superior Court*, 5 Cal.App.2d 374, 377 [42 P.2d 1076], is 'but a permit to do what would otherwise be unlawful.' Nevertheless, we cannot forget that the law contemplates justice, whether the license is granted as a privilege or recognized as a vested right; that under the American system of justice it is the policy of our law that a person should not be deprived even of a 'permit' to engage in a legitimate business without a fair and impartial hearing and without an opportunity to present competent evidence for consideration by the licensing authority in opposition to the proposed revocation of his permit. (*Martin* v. *Board of Supervisors*, 135 Cal.App. 96 [26 P.2d 843] ; *Smith* v. *Foster*, 15 F.2d 115.) ''

The resolution of revocation in the instant case, adopted without notice or hearing or reception of competent evidence, was inoperative and of no legal force. (Cf., *Covert* v. *State Board of Equalization*, 29 Cal.2d 125, 131 [173 P.2d 545] ; *LaPrada* v. *Department of Water & Power*, 27 Cal.2d 47 [162 P.2d 13] ; *Steen* v. *Board of Civil Service Commrs.*, 26 Cal.2d 716, 723 [160 P.2d 816] ; *Carroll* v. *California Horse Racing Bd.*, 16 Cal.2d 164, 167 [105 P.2d 110] ; *General Baking Co.* v. *Board of Street Commissioners, supra,* 242 Mass. 194 [136 N.E. 245, 246].)

The attempted revocation of the permit after appellant had acquired a vested right to drill well No. 8 and, if oil was found, to extract it, constituted a deprivation of ap-

pellant's property in contravention of the Fourteenth Amendment to the Constitution of the United States and article I, section 13, of the Constitution of California.

The conclusions we have reached make it unnecessary to consider appellant's further contention that the 1946 amendments to the zoning ordinance are arbitrary and unreasonable and violative of constitutional inhibitions, and hence invalid in their application to appellant's property in that they restrict such property to residential uses when all the surrounding area is used for oil drilling purposes.

The judgment is reversed with directions to grant the writ as prayed.

Shinn, Acting P. J., and Wood, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied July 29, 1948.