[Civ. No. 11389. Third Dist. Aug. 17, 1967.]

LENORE DeARMOND, as Special Administratrix, etc., et al., Plaintiffs and Appellants, v. SOUTHERN PACIFIC COMPANY et al., Defendants and Respondents.

DARROLL L. BALDWIN, a Minor, etc., Plaintiff and Appellant, v. SOUTHERN PACIFIC COMPANY et al., Defendants and Respondents.

(Consolidated Cases.)

Steel, Arostegui & Nelson, Steel & Arostegui, Padric L. Nelson and Albert J. Arostegui for Plaintiffs and Appellants.

Diepenbrock, Wulff & Plant and Forrest A. Plant for Defendants and Respondents.

PIERCE, P. J.—In these consolidated, court-tried actions for wrongful death and personal injuries as the result of a railroad crossing accident, plaintiffs appeal from a defense judgment in each case.

Negligence of Alfred Byrne, the driver of the automobile involved is conceded.[1] Also conceded is the fact that plaintiffs and plaintiffs' decedent (Mary S. Bynog) (hereinafter, for convenience, generally referred to as "plaintiffs") were guests and not chargeable with Byrne's negligence. Thus liability of defendants depends upon *their* negligence. The trial court found that Byrne's negligence was the sole proximate cause of the accident.

The questions raised on appeal are:

(1) Does a failure by a defendant to comply with the whistle-sounding and bell-ringing requirement of a statute constitute actionable negligence absent a showing that the omission was a proximate cause of the accident?

(2) Did the findings of fact comply with the 1959 amendment of Code of Civil Procedure sections 632 and 634?

(3) Was evidence of a prior guilty plea to a charge of involuntary manslaughter admissible on cross-examination of the driver of the car in which plaintiffs were riding as tending to prove said driver's sole responsibility for the accident?

Our answer to the first question is in the negative and to the last two in the affirmative. We affirm the judgments.

## THE FACTS

The accident happened at Hammonton railroad crossing in Yuba County south of Marysville at approximately 7:20 p.m. on November 17, 1961. It was a dark, *clear*, cold night. The railroad tracks run generally north and south; Hammonton road, east and west. The train involved was southbound, the Byrne vehicle westbound.

---

[1] He admitted having entered a plea of guilty to a charge of involuntary manslaughter for the death of the two women occupants of the car.

**Byrne** operated a 1957 Ford two-door sedan in which there were seven occupants, three (including Byrne) in the front seat, four in the back. Although there is an orchard northeasterly from the crossing, the visibility of trains approaching from the north to a motorist traveling west could not be said to have been materially obstructed since the trees were set back from the road and crossing and in November the foliage was thin. Some distance back from the crossing Byrne was traveling at a speed of from 25-30 miles per hour.

The crossing was equipped with a single, swinging, wigwag signal with a red light and bell. The signal automatically activates when a train reaches a point 2,679 feet north of the crossing. *Byrne,* who was well acquainted with the crossing which he drove across several times daily, *admitted that he saw the signal in operation* when he was some 200 or more feet back, that he had slowed down, and continued to slow down until, climbing the rise of the graded crossing, he had reached what he described as a "rolling stop." He testified that he did not see the approaching train, however, until a fraction of a second before the impact when, as he crossed the track, the engine hit his automobile broadside.

Mary S. Bynog and Mrs Byrne were killed, all the other occupants were seriously injured. Byrne is not a party to the action.

Evidence produced by defendants showed that at and before the collision, the headlight of the train's engine was on, its bell was ringing constantly, the train was traveling at a speed variously estimated by defendants' witnesses at from 30 to 35.5 miles per hour. Plaintiffs' expert fixed its speed at 49 miles per hour. The speed limit for trains was 60 miles per hour. As to the blowing of the whistle, the train had properly signaled its approach to the Beale Road crossing 1,442 feet north of the Hammonton crossing. There is a signal post 80 rods (1,320 feet) north of Hammonton crossing. Defendant Bell, engineer of the train testified: "In the vicinity of the vehicle post west[2] of the Beale crossing, I started a series, two longs, one short and a long, and prolonged this series of

---

[2]Respondents' brief states that in the parlance of trainmen this Marysville to Sacramento train was nevertheless a "westbound" train and that objects ahead of and in the direction the train was "bound" would be stated as "west" of it. We do not find record reference to this, do not deem it a matter judicially to be noticed. Neither do we cavil at the explanation. It is obvious the whistle post intended to be referred to by the witness was that 80 rods north of Hammonton crossing.

whistles. I reached a point about 250 feet from the Hammonton crossing where I started a series of shorter and sharper blasts until I reached a point about 50 feet from the Hammonton crossing.'' The fireman, according to both occupants of the cab of the locomotive, had at the same time started the bell in continuous operation. Engineer Bell explained that at a point 250 feet from the crossing he had observed the lights of the Byrne vehicle and that the ''shorter and sharper'' blasts of his whistle were intended as a warning although he had observed nothing to give cause for alarm since the Byrne automobile was slowing down, as though to make a normal stop and await passage of the train. It was not until both the car and the train were 50 to 75 feet from the crossing and the car had continued its forward motion that the engineer realized it was *not* going to stop. He then put the train into an emergency stop. The minimum stopping distance for a train such as the one involved is 470 feet at 30 miles per hour. The train actually stopped aproximately 600 feet beyond the crossing.

Eyewitnesses near the crossing not identified with the railroad gave testimony substantially corroborating that of the trainmen as regards the functioning locomotive headlight, the whistle blowing and the bell ringing. One witness heard the whistle and saw the beam of the headlight when the train was more than 400 feet north of the crossing. Another testified the whistle signals had endured for at least 30 seconds before the collision. (If the train traveled at 30 miles per hour, in 30 seconds it would have gone 1,320 feet.)

Significant testimony was given by a Mrs. Barnes. With her two sons she was driving along Hammonton road easterly shortly before the accident. She had stopped before crossing the tracks when she saw the wigwag in operation, saw the headlight of the approaching train, estimated its speed at from 25 to 30 miles per hour, saw that she had time to cross and did so. Having crossed, she met and passed the Byrne car. She was unclear exactly where it was at the time with reference to the crossing but she had only traveled 200 to 300 feet when, having heard the crash, she stopped her car and turned around to render assistance to the injured. Her son David substantially corroborated his mother's testimony.

The evidence, including Byrne's testimony, furnishes no clear explanation as to why he and the others in his car who survived the accident did not see or hear the approaching train, clearly visible and audible to others. The fact that the

automobile's windows were up (according to all survivors excepting Byrne who did not recall), plus the fact that some or all of the seven occupants of the car were engaged in conversation before the accident and perhaps until the accident would seem an insufficient answer. One plaintiffs' witness described a conversation at the hospital with Mary F. Bynog, daughter of decedent Mary S. Bynog and an occupant of the car. According to this witness, Mary told him that Byrne appeared to have "froze at the wheel."

The trial court's memorandum opinion, properly usable by us to explain, but not to alter, the court's findings (rule 5(a) California Rules of Court, *Union Sugar Co.* v. *Hollister Estate Co.*, 3 Cal.2d 740, 749 [47 P.2d 273], *Trans-Oceanic Oil Corp.* v. *City of Santa Barbara*, 85 Cal.App.2d 776, 790 [194 P.2d 148]) shows that the judge believed that portion of Byrne's testimony in which he said that he had observed the wigwag in operation from a distance some 200 feet or more back from the crossing, and that he had come almost to a halt a few feet from the tracks. The court said : "[A]t this point, he alone had the power to avert the collision. As the witness Mary Frances Bynog stated. 'He seemed to freeze up.' The train was almost upon the crossing ; the engineer had seen the vehicle slow down and did not anticipate difficulty ; his headlight was on and from a preponderance of the evidence, the whistle was blowing. Two or even four crossing lights would have not alerted the driver to any greater extent. To be sure, if the train had stopped at each crossing, the accident would not have happened. But we are concerned with proximate cause, not negligence per se." Obviously, however, the trial court did not believe Byrne's testimony that he had kept a sharp look-out for an approaching train. It could not have believed that. The train, consisting of locomotive, box car and caboose, did not suddenly materialize at Hammonton crossing out of nowhere—like an Athena springing full-grown and full-armed out of the brain of Zeus.

The general findings of fact included findings that neither the railroad nor its engineer was negligent in the operation of the train nor was the railroad negligent in the maintenance of its equipment, including its warning and signal devices. It found that the "sole proximate cause of the collision . . . was the negligence of the driver of said motor vehicle, ALFRED JOHN BYRNE."

Plaintiffs submitted counterfindings. They also submitted a request for special findings. Some of these were made by the

court; others (to be discussed below) were refused. One special finding requested was made after modification, towit: "That defendants failed to sound a whistle or bell *exactly* at a distance of ~~at least~~ 80 rods from Hammonton Road, but did sound a whistle for some lesser distance, the exact extent of which is unknown to the court."[3]

## RE SECTION 7604

Public Utilities Code section 7604 in part here material requires that at crossings outside cities a locomotive engine's bell must be rung or its whistle sounded at a point commencing 80 rods (a quarter of a mile) from a crossing. If a bell is rung, the ringing is to be continuous until the road is crossed. The whistle is required to "be kept sounding at intervals until [the locomotive] has crossed" the road. The section also provides: "The corporation is . . . liable for all damages sustained by any person, *and caused by its locomotives, train, or cars*, when the provisions of this section are not complied with." (Italics supplied.)

Defendants do not deny that plaintiffs were members of a class intended to be protected by section 7604. Both parties argue at length the question whether there was or was not a substantial compliance with the bell-ringing and whistle-sounding requirement of the section to be implied in the court's use and substitution of the word "exactly" and other findings. Plaintiffs contend that since there was not exact compliance with the requirement of the statute, *substantial* compliance will not do; and that anyway the latter cannot be implied from the findings made. Defendants argue that even though there may have been a violation, no negligence arises if the violation is excused under the test applied in *Alarid* v. *Vanier*, 50 Cal.2d 617, 624 [327 P.2d 897].

We do not think it necessary to enter the debate as to whether or not the court impliedly found that defendants had sustained the burden of showing that they had done "what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law" and were therefore excused from exact compliance with the statute. (The *Alarid* test.)[4] Since the

---

[3]Modification of the requested finding is indicated by italics and strikeouts. The finding as requested was apparently intended by plaintiffs as a substitute for a finding immediately preceding it "That defendants failed to sound a whistle or bell between Beale Road crossing and Hammonton Road crossing." This was refused.

[4]It is to be noted, however, that the court expressly refused to find (as plaintiffs had requested) that defendant had violated section 7604.

court did *expressly* find that Byrne's negligence was the sole proximate cause of the accident and that no act or omission of defendants proximately contributed to the accident, section 7604 fades out of the picture. The statute expressly limits liability to those whose damages are *"caused"* by failure of the railroad to comply with the 80-rod-bell-or-whistle-sounding requirement. We cannot accept plaintiffs' proposition that the Legislature did not intend "cause" in the legal sense, but on the contrary, equated "cause" with any and every happening in which a contact between locomotive and automobile occurs. So to hold would lead to the ridiculous result of liability for any and every collision where it is shown that a whistle-or-bell-sounding-omission has occurred regardless of how remote or unrelated to the accident such omission may be.

■ There are four elements to actionable negligence: (1) a duty, (2) a breach of that duty which (3) proximately causes (4) an injury to a plaintiff to whom the duty is owed.

It is true that proximate cause (usually a question for the fact-finder) is sometimes confused with the duty of care (a question for the court). (See: *Raymond* v. *Paradise Unified School Dist.*, 218 Cal.App.2d 1 at page 6 [31 Cal.Rptr. 847], and cases and authorities there cited.) It is true also that Dean Prosser has described "proximate cause" as a "complex term of highly uncertain meaning under which other rules, doctrines and reasons lie buried" (Prosser, *Proximate Cause in California*, 38 Cal.L.Rev. 369, at p. 374), but that confusion or uncertainty does not erase proximate cause as a necessary element without which actionable negligence cannot lie. (Prosser. *op. cit.* p. 375; Green, *Proximate Cause in Texas Negligence Law*, 28 Texas L.Rev. 472, at p. 474 et seq.; *Ulwelling* v. *Crown Coach Corp.*, 206 Cal.App.2d 96, 119 [23 Cal. Rptr. 631].) ■ In California in cases interpreting section 7604 or its predecessor, Civil Code section 486, it has been held that, notwithstanding an omission to give the statutory warning, proximate cause is handmaiden to the cause of action. (*Eaton* v. *Southern Pac. Co.* (1913) 22 Cal.App. 461, 473 [134 P. 801]; *Lawrence* v. *Southern Pac. Co.* (1922) 189 Cal. 434, 442 [208 P. 966]; *Smellie* v. *Southern Pac. Co.* (1933) 128 Cal.App. 567, 575 [18 P.2d 97, 19 P.2d 982]; *Davis* v. *Lane* (1938) 24 Cal.App.2d 400, 404-405 [75 P.2d 565];[5] *Mer-*

[5] In Prosser, *Proximate Cause in California*, 38 Cal.L.Rev. 369, at pages 377-378, the author, citing the *Davis* case, says: "Failure to blow a whistle more than 950 feet from a railway crossing is not a cause where

*lino* v. *Southern Pac. Co.* (1955) 132 Cal.App.2d 58, 66 [281 P.2d 583].)

Even had section 7604 not *expressly* limited liability for violations of the 80-rod-whistle-sounding-or-bell-ringing requirement to cases where causation is shown, that limitation would be implied. (*Satterlee* v. *Orange Glenn School Dist.* (1947) 29 Cal.2d 581 [177 P.2d 279].) In *Satterlee* the court says (at p. 588) : "[I]f the evidence establishes that the . . . defendant's violation of the statute or ordinance *proximately caused the injury* and no excuse or justification for violation is shown by the evidence, responsibility may be fixed upon the violator without other proof of failure to exercise due care. [Citations.] " (Italics supplied.)

Plaintiffs rely upon *Orcutt* v. *Pacific Coast Ry. Co.* (1890) 85 Cal. 291 [24 P. 661]. It stated that a violation of Civil Code section 486 created prima facie liability. Reliance upon that case as authority involved lifting an isolated paragraph (on p. 297) from context. Reading further (on p. 298) the court adds: "Even if, as defendant contends, it was incumbent upon plaintiff to prove that the failure to give the required signals was the proximate cause of the injury before he could recover . . . still, as the evidence on this point was strongly conflicting, we would, upon the same principle applicable to a finding by a jury upon conflicting evidence, be constrained to hold that the jury had, in finding for the plaintiff, impliedly passed upon it in his favor."[6] Even should the *Orcutt* case be construed to stand for the rule postulated by plaintiffs, subsequent Supreme Court decisions (see cases cited *supra*) have long since abandoned the liability-without-causation theory.

### RE THE SPECIAL FINDINGS REQUEST UNDER CODE OF CIVIL PROCEDURE SECTIONS 632, 634

As stated above, a number of requests for special findings were made by plaintiffs. We have discussed two of them

the whistle is blown continuously after 750 feet and the plaintiff does not hear it. . . . There are of course many more such cases; and in all of them the injury would have occurred regardless of the defendant's act or omission.

"In cases of this kind the courts of other states have arrived at a rule, commonly known as the 'but for' or 'sine qua non' rule . . . . This has been said, in substance, in California. . . .

"In the ordinary case the 'but for' rule works well enough as a test of causation alone. . . ."

[6]The statement in *Orcutt* relied upon by plaintiffs was dictum, expressly so described in the concurring opinion of Justice Thornton, who disapproved that "dictum." (85 Cal. at p. 299.)

above. Others were requests for contrary findings of negligence on the part of the defendant railroad with respect to matters which already had been expressly discussed by the court in its opinion and all were covered by the general findings of the court that defendants were not negligent either in operating the train or in maintaining warning devices, and that the death and injuries of plaintiffs were not proximately caused by defendants. Some requests were for findings on matters clearly not established by any evidence, e. g., the court was asked to find that the speed of the train was excessive. The speed limit, however, was shown to be 60 miles per hour. The greatest speed claimed was well below that. No peculiar circumstances indicating that careful operation dictated a lesser speed have been pointed out to us.

The request to find that plaintiffs were not contributorily negligent was granted and the finding made.

Section 632 of the Code of Civil Procedure as amended in 1959 (Stats. 1959, ch. 637) included the following new provisions: ''The statement of facts found shall fairly disclose the court's determination of all issues of fact in the case.'' In the same act section 634 of the Code of Civil Procedure was amended to provide in part, ''If upon appeal . . . it appears that the court has not made findings as to all facts necessary to support the judgment, or that the findings are ambiguous or conflicting upon a material issue of fact, the [appellate] court . . . shall not infer that the trial court found in favor of the prevailing party on such issue if it appears that the party attacking the judgment made a written request for a specific finding on such issue . . . prior to the entry of judgment. . . .''

The amendment of said sections was preceded by 11 years of study, first by a committee of prominent attorneys, later by the State Bar Committee on the Administration of Justice, and, over the years by the committees of several sessions of the Legislature which considered the legislative bills during the period from 1953-1959 when the legislation as it is quoted above, and as it was in effect when this action was tried, was enacted. The chairman of the lawyer's committee. Harry W. Horton of El Centro, has written two articles in the California State Bar Journal, in 1959 *Findings of Fact,* 34 State Bar J. 850, and in 1961 *Findings of Fact and Appeals,* 36 State Bar J. 83, explaining the history and purposes of the amendment. It is common knowledge that in actual practice the preparation of ''proposed'' findings of fact was (and still

is) almost invariably delegated by the court to the attorney for the successful litigant. Before 1959 no statutory provision existed *requiring* the trial court to settle objections or amendments to proposed findings and there was no statutory provision for special or counter-proposed findings, which if offered and rejected were sometimes not included in the record. The broad purpose of the amendment seems to have been to alleviate the frustration of losing litigants and their attorneys confronted with noncommunicative trial judges who did not explain their rulings in any memorandum opinion and who frequently (with the aid of successful counsel) couched their findings of fact in terms so "ultimate" that it was extremely difficult, if not impossible, to determine either the factual basis or legal theory of the decision. Cases are legion in which the frustration of the loser has been shared by reviewing courts.

▆ If findings are to serve any purpose they should, as section 632 now requires "fairly disclose the court's determination of all issues of fact."[7]

The amendments, however, have been construed not to change the long-established rule that ultimate, and not evidentiary, facts be stated. (*South Santa Clara, etc. Dist.* v. *Johnson,* 231 Cal.App.2d 388, 404-405 [41 Cal.Rptr. 846]; *Lewetzow* v. *Sapiro* (1961) 188 Cal.App.2d 841 [11 Cal.Rptr. 126].) We subscribe to the ruling of those cases. Just how "ultimate" a fact may be before it metamorphizes into a "conclusion of law" is often a very difficult and delicate question. (2 Witkin, Cal. Procedure (1954) p. 1843.) We also subscribe to the statement of Presiding Justice Moore in his concurring opinion in *Voss* v. *Friedgen* (1956) 141 Cal.App.2d 135, 142-143 [296 P.2d 424] (which predated the 1959 amendments). His protest, relating to an action on a common count where fraud was involved, was against the practice of making findings in the general language of the complaint. He concludes: "[I]t is going too far for trial courts to bundle their findings on serious factual issues into a few phrases and start them to the reviewing courts as 'findings.' I abhor the practice as a careless, hasty, indifferent method for trial courts to pursue. It not only imposes an undeserved

---

[7]Controversy still exists as to whether mandatory general findings of fact should be abolished. The Judicial Council in 1965 in its Twentieth Biennial Report, page 18 et seq., recommended legislation abolishing findings except when special findings are expressly requested. The proposal was not accepted and has not been renewed. We do not enter the lists. We *do* assert that when findings are made they should be meaningful.

burden upon the appellate courts, but, also, it makes no record of the judicial effort of the trial court. Hasten the day when there will be carefully prepared findings on all factual issues.''

The obverse of the coin is expressed in the warning by Mr. Horton in his later article (36 State Bar J.) where he states on page 85 that special care should ''be exercised in relation to requests for special findings. It should not turn into a contest to see which side can get the most one-sided record but to get findings on specific contested facts which, depending on the way decided, would have a direct bearing on the conclusion of law to be applied.''

Our observations by way of warning are obiter. ▉ As applied to this case, the trial judge heeded carefully the admonition of the amendments of sections 632 and 634 and the adjuration of Presiding Justice Moore quoted above. The trial court's findings are within both the letter and spirit of the amended rules. They are aided by a lucid memorandum opinion. There has been a full determination of the essential facts and a clear statement of the reasons of the court for reaching that determination. All facts necessary to support the judgments are found. There are no ambiguities, no conflicts.

▉ The last contention of plaintiffs, that the court improperly admitted into evidence the admission by Byrne on cross-examination that he had pleaded guilty to involuntary manslaughter, is quickly answered. It was a declaration against interest, it was relevant to the issue that he, and not defendants, was solely responsible for the accident. Even had he been a party defendant to the litigation, the evidence would have been admissible. (Witkin, Cal. Evidence, (2d ed. 1966), pp. 474-475.) While a controversy exists as to whether such evidence should be admitted when the witness *is* a party, the objection being that its relevancy may be outweighed by its prejudicial effect, that contention is materially watered down when the witness is not a party and only his credibility as a witness is at stake.

The judgments are affirmed.

Friedman, J., and Regan, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied October 11, 1967.