[Civ. No. 27385. First Dist., Div. Two. May 19, 1971.]

ALFORD E. LENO et al., Plaintiffs and Appellants, v.
YOUNG MEN'S CHRISTIAN ASSOCIATION OF SAN FRANCISCO,
Defendant and Respondent.

## COUNSEL

Belli, Ashe, Ellison, Choulos & Lieff, Melvin M. Belli and David Kogus for Plaintiffs and Appellants.

James J. Duryea for Defendant and Respondent.

## OPINION

**TAYLOR, J.**—Plaintiffs, Alford and Blanche Leno, appeal from a judgment of nonsuit entered at the close of the presentation of their evidence in an action for damages for the wrongful death of their 20-year-old son James, who on May 9, 1965, drowned during the ocean checkout of a scuba-diving class given under the auspices of defendant, Young Men's Christian Association of San Francisco (hereafter Y). Plaintiffs contend that they produced sufficient evidence of the Y's liability to go to the jury, that the trial court erred in concluding that the diving course instructor was not an agent of the Y, acting in the course and scope of his employment, and that there was sufficient evidence that the Y's negligence was the proximate cause of the fatal accident.

Viewing the record in the light most advantageous to plaintiffs, as we must on appeal from a judgment granting a nonsuit, the record reveals the following facts: In March 1965, Dan Murphy, a member of the Y and a close friend of the deceased, saw a scuba-diving course advertised on the bulletin board of the Y for about $35-$40. Both signed up for the course and Leno became a member of the Y.

The course was taught by George Del Secco, who, like other scuba-diving instructors in the Bay Area, contributed his services to the Y, did not receive any remuneration, and also operated a store that sold diving equipment. The Y provided the tanks, regulators and harnesses used by the students; Del Secco provided the weight belts, maintained all of the equipment, and filled the air tanks. The students usually purchased the fins and snorkels.

Del Secco, who had been diving since 1958, took over the teaching of the scuba-diving course at the Y from the former instructor in 1961. He learned to scuba dive from his predecessor and after being an assistant instructor for a short time, he took over as head instructor. He was not certified by either the National YMCA or the National Association of Underwater Instructors (NAUI). However, on one occasion prior to May 1965, Gallo, the physical education director of the Y and Del Secco's supervisor, asked Del Secco if he wanted to take a National YMCA certification test and indicated that the Y would pay for it. On the scheduled weekend, Del Secco went to San Jose but then became reluctant to take the test as it was "just a rigamarole." He called Gallo, who indicated that it was up to Del Secco whether or not to take the test. Del Secco then decided not to proceed with the test, although he was under the impression that the Y preferred certified instructors and that someone in the national organization was pushing for it.

In January 1965, the Y had asked one of the leading scuba experts in the area, Stanley H. Sheley, to sit in and evaluate Del Secco's course. Sheley was certified as a scuba instructor by both the National YMCA and the NAUI. Sheley's written report indicated that Del Secco's course was fair, but his final analysis was *that it was unsafe as no life saving instruction was included*. The report was submitted to Del Secco's supervisor, Gallo, who never questioned Sheley about it. About 10 months after Leno's fatal accident, the Y terminated the course.

The course in which Leno participated consisted of eight or nine sessions in the pool at the Y. Thereafter, students usually went for an ocean checkout in order to complete the course and receive a Y certificate of proficiency. The certificate indicates to other divers and the public that its holder has had adequate training in the fundamentals on the use of scuba equipment and the safety procedures required. The filling of the air cylinders used in scuba diving requires expensive equipment and many dealers will not fill cylinders unless the diver has a certificate. Sometimes additional pool sessions were required before a student was invited to an ocean checkout. A student could not earn a Y certificate of proficiency as a diver unless he passed the ocean checkout. Del Secco had never

passed a student who did not go through an ocean checkout. An ocean checkout was a standard procedure in other scuba-diving courses taught in the Bay Area in 1965.

On May 9, 1965, Del Secco invited seven to nine of his Y students, including the deceased, to Monastery Beach near Carmel for the ocean checkout. As qualified assistant instructors are mandatory for ocean checkouts, Del Secco took seven to nine student instructors along, including Louisa Sofaer, who had been assistant instructor for seven to eight months; Del Secco had trained her and all of the assistant instructors who accompanied him to Monastery Beach on May 9. Miss Sofaer had been on four to five ocean checkouts prior to being assigned as Leno's instructor. On May 9, the customary procedure for ocean checkouts was followed: In the mornings, the students got used to the ocean water and used the surface skin-diving equipment; after a break, they proceeded to the more difficult task of using the scuba equipment in the afternoon. Each student's equipment was checked out by his instructor.

At the time of the accident, Leno was wearing the standard scuba equipment that weighed about 75 pounds, including: 1) a face mask and breathing tube or snorkel; 2) fins; 3) a foam wetsuit; 4) weight belt to counter the buoyancy of the wetsuit; 5) a standard diving cylinder containing 70 cubic feet of air at a pressure of 2,250 pounds per square inch, held on his back by a harness; and 6) a regulator or breathing apparatus which regulates the air pressure and compensates for depth increase and decrease. The air cylinder has a reserve valve at the top with a lever on the side. When the cylinder is full, the reserve lever is up. When the air pressure is down to about 300-400 pounds, breathing is restricted and the diver becomes aware of it and is warned that he is getting near the end of his air supply. At this time, he reaches for the reserve lever to release the last 300-400 pounds of air, and begins to surface.

Leno's regulator was a two-stage single-hose regulator; the first stage breaks the air pressure down to 110-120 pounds per square inch and delivers it to the second stage; the second stage, which consists of a mouthpiece and exhaust valve, delivers the air to the diver. The diver actuates the second stage by inhaling and drawing a diaphragm down against the lever. *He was not wearing a neck strap to hold the regulator in front of his face, as Del Secco had removed it.*

*Leno was also not wearing a life vest.* Del Secco believed that in 1965 life vests were not a necessary piece of equipment as they tended to confuse beginning students and, therefore, did not recommend them. However, he admitted that a life vest is "a very good item to have." As the Y did not provide life vests for the students, only those who wanted to rent or

buy life vests used them. Two of plaintiffs' experts testified that in 1965, most scuba-diving courses used life vests, as these were an important part of the safety equipment. One of these experts indicated that in 1965, some schools were a little behind and were not using life vests. He insisted that his students wear life vests for the first ocean checkout. Del Secco did not think a life vest was necessary for students participating in an ocean checkout.

During the morning of May 9, Leno had some trouble with his regulator and mouthpiece and spoke to Del Secco and Miss Sofaer. However, in the afternoon, he submerged successfully. Later in mid-afternoon, he indicated to Miss Sofaer that he was having trouble with his regulator. She pulled his reserve lever down and instructed him to surface and use the snorkel. At this time, they were about 200 yards from shore in water 15-20 feet deep.

Leno followed her instructions and began to swim toward the shore on top of the water. They swam until they got to some kelp, at which time Miss Sofaer told him to resume the use of scuba equipment and to swim to shore underneath the kelp. On the way through the kelp, he yelled for help. However, Miss Sofaer had surfaced and briefly lost sight of him, although it is mandatory for assistant instructors to remain close to students at all times during the ocean checkout. Instructors are supposed to be no more than an arm's length away, but this is not always the case. Miss Sofaer admitted that she should have stayed close to Leno at the time he was in trouble.

After Miss Sofaer lost sight of Leno, she looked around and followed a trail of bubbles until she found him lying on the bottom. At this time, she released his weight belt and he immediately came to the surface. She followed him up and began shouting for help. Some other divers who were close by appeared with a float and put him on it. By the time he was brought to shore, his face was blue and his eyes were dilated. It appeared that his heart had stopped. An ambulance was immediately called and Sheley, who was about 200 feet away with some other divers, immediately began mouth-to-mouth resuscitation. About 30 minutes later, the ambulance crew, summoned by Del Secco, appeared and attempted to revive Leno with their equipment. Sheley testified that valuable moments were lost by the ambulance crew and he soon sent them away and resumed mouth-to-mouth resuscitation and external heart massage all the way to the hospital. At the hospital, the doctors opened up Leno's chest and trachea and attempted to revive him. Leno died about 7 hours and 15 minutes later after he was first brought to shore. The death certificate indicated that the cause of death was drowning.

Plaintiffs' experts testified in response to hypothetical questions that an assistant instructor in Miss Sofaer's situation should have dropped Leno's weight belt the first time that he surfaced. In the opinion of one, a life vest would have kept Leno on top of the water.

After the death of Leno, Del Secco took all the scuba equipment that Leno used to the Y and suggested it be checked out by Mr. Giddings, the owner-operator of a diving school and a purveyor of scuba equipment with 14 years of experience as a diver. This was done and Giddings examined the reserve valve. He found it corroded to some degree, difficult to pull down, and concluded it had not been lubricated for some time. In his opinion, this could be hazardous, as a diver who was nervous or upset might conclude that the reserve lever had already been pulled down. Giddings would not have knowingly given that reserve lever to one of his own students. In Giddings' opinion, the absence of the neck strap could also present a hazard, as in the water, the regulator can swing away from the mouth over the shoulder and be difficult to retrieve.

The record indicates that the motion for a nonsuit was granted as the trial court found that there was no evidence that Del Secco was acting as an agent of the Y on May 9, 1965. ▪ A nonsuit may be granted only where, disregarding conflicting evidence on behalf of defendants and giving to plaintiffs' evidence all the value to which it is legally entitled, therein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiffs (*O'Keefe* v. *South End Rowing Club,* 64 Cal.2d 729, 733 [51 Cal.Rptr. 534, 414 P.2d 830, 16 A.L.R.3d 1]). ▪ Neither the appellate court nor the lower court may weigh the evidence or consider the credibility of the witnesses (*Lasry* v. *Lederman,* 147 Cal.App.2d 480 [305 P.2d 663]). ▪ Plaintiffs may rely on that portion of testimony given under Code of Civil Procedure section 2055, which is favorable to them, and disregard the unfavorable portions (*Anthony* v. *Hobbie,* 25 Cal.2d 814 [155 P.2d 826]). ▪ However, the evidence produced by plaintiffs must support a logical inference in their favor, sufficient to raise more than a mere conjecture or surmise of the question to a jury and a court should not put itself in the incongruous position of destroying logic to hold a case in court (*Reynolds* v. *Natural Gas Equipment, Inc.,* 184 Cal.App.2d 724, 731 [7 Cal.Rptr. 879]). ▪ We have concluded that the judgment of nonsuit entered herein must be reversed as applying the above rules to the facts adduced by plaintiffs, there was sufficient evidence to submit the matter of the Y's liability to the jury (*Gherna* v. *Ford Motor Co.,* 246 Cal.App.2d 639, 646-647 [55 Cal.Rptr. 94]).

We think there is no question that plaintiffs made a sufficient prima facie showing that Del Secco, as instructor of the course, was the Y's agent. The trial court apparently agreed, as it admitted Del Secco's testimony concerning his declarations to his students (*Dooley* v. *West American Com. Ins. Co.,* 133 Cal.App. 58 [23 P.2d 766]). Although the evidence indicates that Del Secco was not paid by the Y for his services, this was customary in the area at the time, since the Y is an eleemosynary organization and scuba instructors usually own shops that sell the necessary equipment. It is uncontroverted that the course was advertised on the bulletin board of the Y. Leno and the other students paid the Y $35-$40 for the course which was conducted at the Y pool and for which the Y supplied the tanks, regulators and harnesses. Under these circumstances, any student would reasonably assume that Del Secco was the Y's agent (Civ. Code, §§ 2317, 2318). Gallo, the Y's physical education director in 1965, exercised supervisory authority over Del Secco. He ordered the evaluation of the course made in January 1965 by Sheley, and also suggested to Del Secco that the Y would pay for an instructor's certification course. The Y's acceptance of the fee for the course is an express act of ratification as are its other actions. ■ It is Hornbook law that consideration is not essential to the creation of an agency (*Brand* v. *Mantor,* 6 Cal.App.2d 126 [44 P.2d 390]). On the completion of the course, a student received a Y certificate of competency that was given only if the student had participated in an ocean checkout with the scuba equipment. Such ocean checkouts were standard procedure in all scuba courses then taught in the Bay Area. Although Del Secco testified that the students were not required but merely invited to attend the May 9 session at Monastery Beach, he indicated that no student could pass the course and receive his certificate of competency without an ocean checkout having been completed. Furthermore, it is a matter of common knowledge that the skill of scuba diving, once acquired, is not exercised in swimming pools, but in large bodies of water, usually oceans. Del Secco selected and instructed all the assistant instructors used at the ocean checkout.

■ The existence of an agency is a question of fact (*Brokaw* v. *Black-Foxe Military Institute,* 37 Cal.2d 274, 278 [231 P.2d 816]; *Sokolow* v. *City of Hope,* 41 Cal.2d 668, 675 [262 P.2d 841]). ■ An agent has implied authority to use any means that are incidental to and reasonably proper in the performance of an assigned task (*Vind* v. *Asamblea Apostolica, Christo Jesus,* 148 Cal.App.2d 597, 604 [307 P.2d 85]). Since Del Secco's principal acts in teaching the course were within his authority, he also had the authority to appoint Miss Sofaer as his subagent. As the Y, through Del Secco and Miss Sofaer, undertook to have the scuba class taught *on its* premises, with its equipment, and culminating in the award

of its certificate of proficiency, it had the duty to do so with reasonable care (*Garber* v. *Prudential Ins. Co.*, 203 Cal.App.2d 693, 702 [22 Cal. Rptr. 123]).

■ As plaintiffs had made a prima facie showing that the Y held Del Secco out as its agent in teaching the scuba course, the question of whether the May 9 ocean tryout occurred within the course and scope of the agency should have been left for the jury to determine (*Adams* v. *Wiesendanger,* 27 Cal.App. 590 [150 P. 1016]). Assuming that the Y had not expressly authorized Del Secco to take the scuba diving students on the ocean checkout, the activity nevertheless would be within the course and scope of his assigned task as it occurred while he was engaged in duties that he was designated to perform and it related to those duties (*Garber* v. *Prudential Ins. Co., supra*).

Even if Del Secco were an independent contractor, the Y could be held liable for his negligent conduct or that of his assistants because of the Y's relationship with the deceased party (*Van Arsdale* v. *Hollinger,* 68 Cal.2d 245, 251 [66 Cal.Rptr. 20, 437 P.2d 508]). Here, the Y owed a duty to persons who, for a fee, took the scuba-diving course that was advertised under its auspices, supervised by its physical education director, held on its premises, and conducted with equipment that it supplied. This duty was nondelegable and required the exercise of reasonable care in the selection of competent instructors and assistant instructors and the provision and maintenance of adequate equipment. One who retains an independent contractor to perform work that is extrahazardous or which is inherently dangerous, may be held liable for failure to take the necessary precautions (*Van Arsdale* v. *Hollinger, supra,* p. 252). Here, the Y was aware of Del Secco's lack of certification and his refusal to undergo a certification test, and had a written report from an expert indicating that the course contained insufficient life saving material. Thus, there was sufficient evidence to require the submission of the case to the jury, even on an independent contractor theory.

It is also argued that there was no substantial evidence to indicate that Leno's death was proximately caused by the negligence of Miss Sofaer, as there were the intervening acts of the ambulance crew, Mr. Sheley, and the doctors who cared for Leno in the hours preceding his death. However, the death certificate indicated that the cause of death was drowning, apparently brain damage from lack of oxygen when Leno, an inexperienced diver, swam under the kelp with the defective regulator. As he never was able to resume any normal breathing pattern after he was brought to the surface, despite the extensive efforts at resuscitation, heart massage, tracheotomy and open heart massage, there was substantial evidence that the

proximate cause of his death was his submersion in the water. ■ Proximate cause is a question of fact for the jury (*DeArmond* v. *Southern Pacific Co.,* 253 Cal.App.2d 648 [61 Cal.Rptr. 844]). ■ As to superseding causes, California has adopted the rules set forth in the Restatement of Torts, sections 442-453 (*Stewart* v. *Cox,* 55 Cal.2d 857, 863-864 [13 Cal. Rptr. 521, 362 P.2d 345]) as follows: Under these rules the fact that an intervening act of a third person is done in a negligent manner does not make it a superseding cause if a reasonable man knowing the situation existing when the act of the third person is done would not regard it as highly extraordinary that the third person so acted or the act is a normal response to a situation created by the defendant's conduct and the manner in which the intervening act is done is not extraordinarily negligent (see Rest., Torts, § 447; *Stasulat* v. *Pacific Gas & Elec. Co.,* 8 Cal.2d 631, 637 [67 P.2d 678]).

In view of the above, the question of the Y's liability for Leno's death should be submitted to the jury. The judgment is reversed.

Shoemaker, P. J., and Kane, J., concurred.