[L. A. No. 28683. In Bank. June 7, 1968.]

HERMAN L. WEINER et al., Plaintiffs and Respondents, v. CITY OF LOS ANGELES et al., Defendants and Appellants; STANLEY J. LAPPEN et al., Interveners and Appellants.

Roger Arnebergh, City Attorney, Bourke Jones, Assistant City Attorney, and Jack L. Wells, Deputy City Attorney, for Defendants and Appellants.

Mitchell, Silberberg & Knupp, Harry C. Sigman, Hilbert P. Zarky, Richard M. Mosk, Dryden, Harrington & Swartz and Jacob Swartz for Interveners and Appellants.

Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Loeb & Loeb and Herman F. Selvin for Plaintiffs and Respondents.

BURKE, J.—This controversy presents questions of the proper construction and application of certain provisions of the Municipal Code of defendant City of Los Angeles as they relate to the minimum required setback and front yard requirements for a vacant lot which plaintiffs seek to develop for residential purposes. As hereinafter appears, we have concluded that the trial court erred in its conclusion that plaintiffs' planned development complied with such requirements, and the judgment must accordingly be reversed.

The facts are substantially undisputed. In June 1963 plaintiffs purchased a vacant residential lot, numbered 20, fronting on Lindbrook Drive in block 1 of tract No. 9200 in Los Angeles. In October 1963 they applied to the city department

of building and safety for permits to grade the lot, to build a retaining wall, and to build a residence in accordance with plans and specifications submitted with their application. The plans showed that the building would be set back on the lot 20 feet 6 inches from the line separating the lot from Lindbrook Drive so that the front yard of the lot would be 20 feet 6 inches deep. The city checked and approved the plans and issued the permits to plaintiffs, who then spent some $15,000 for the grading work and entered into a contract with a licensed contractor to construct a residence on the lot.

In June 1964, after the grading was completed but before construction of the residence had started, defendant superintendent of building issued an order directing plaintiffs to provide revised approved plans and building permit showing the proposed residential building setback in line "with the prevailing setback" on Lindbrook Drive, and further directing plaintiffs to reduce the height of their front yard retaining wall. No work has since been done on plaintiffs' lot.

Plaintiffs then brought this suit for declaratory relief to establish their right to build their residence as previously planned, and to invalidate the order of June 1964. They contended, *inter alia,* that their proposed construction did no violence to the applicable sections of the city's municipal code. The owners of lot 19 (next door to plaintiffs' lot 20) filed a complaint in intervention. Both the city and interveners urged that plaintiffs' plans did not comply with the code provisions. The trial court found for plaintiffs and rendered judgment declaring that their proposed front yard and setback of 20 feet 6 inches deep, and their retaining wall, comply with the municipal code; that the June 1964 order directing them to revise their plans and building permit to comply with the "prevailing setback" line on Lindbrook Drive and to reduce the height of the retaining wall is invalid; and that interveners had no standing to contest the validity of the permits. This appeal by defendant city and its building superintendent, and by interveners, followed.

Attached is a sketch of the Lindbrook block in which plaintiffs' lot 20 is situated. Lots 18, 19, 21, 22 and 23 are improved with residential construction erected prior to 1938.

Resolution of the present controversy as to the building setback on plaintiffs' lot turns upon the construction of section 12.08 C.1 of the Los Angeles Municipal Code. That section, which became effective in October 1950, and is a portion of the city's Comprehensive Zoning Plan, provides in

APPROXIMATE SCALE: 1" = 100'

pertinent part: "1. Front Yard—There shall be a front yard of not less than 20% of the depth of the lot, but such front yard need not exceed 20 feet; *provided, however, that where lots comprising 40% or more of the frontage are developed with buildings having front yards with a variation of not more than ten feet in depth, the average of such front yards shall establish the required front yard depth for the entire frontage, but said depth need not exceed 40 feet.* In determining the required front yard, buildings located on *key lots* . . . shall not be counted." (Italics added.)

The issue is whether the italicized proviso of the code section, construed and applied reasonably to achieve its purpose,

requires a setback on plaintiffs' lot 20 in excess of the 20 feet specified in the first clause of the section, above quoted.

At the outset it is necessary to determine just which lots comprise the frontage of the Lindbrook block in which plaintiffs' lot is located, and just which lots are key lots the buildings on which are not to be counted in determining a required front yard under the code section. The parties agree that lot 24 is a "reversed corner lot" as defined by section 12.03 of the Los Angeles Municipal Code, with its frontage on Beverly Glen Boulevard rather than upon Lindbrook; they further agree that lot 23 is accordingly a key lot.[1]

Plaintiffs contend, however, that under the code definitions the frontage of lot 18 is on Holmby Avenue rather than upon Lindbrook, thereby also rendering lot 18 a reversed corner lot and lot 19 a key lot. The dimensions of lot 18 are 111.40 feet along Holmby Avenue and 144.48 feet along Lindbrook. Thus the narrowest street frontage of lot 18 as prescribed in the definition of front lot line is on Holmby. However, as further provided in the exception to the definition, it appears that in this case "the latest tract deed restrictions specify another line as the front lot line." The parties have stipulated that the deeds to the first purchasers of each of the lots in tract 9200 (which includes the Lindbrook block) contained "restrictions with respect to the front setback of each lot," and that such "front setback" of *each* of the Lindbrook lots here involved,[2] *including lot 18,* was 35 feet *along Lindbrook Drive;* further, that the lot 18 deed contained no front setback restriction along Holmby.[3] There is

---

[1]Section 12.03 sets forth these relevant definitions:

"LOT LINE, FRONT—In the case of an interior lot, a line separating the lot from the street or place; and in the case of a corner lot, a line separating the narrowest street frontage of the lot from the street, except in those cases *where the latest tract deed restrictions specify another line as the front lot line.* [Italics added.]

"LOT LINE, SIDE—Any lot boundary line not a front lot line or a rear lot line.

"LOT, REVERSED CORNER—A corner lot the side street line of which is substantially a continuation of the front lot line of the first lot to its rear.

"LOT, INTERIOR—A lot other than a corner lot.

"LOT, KEY—The first interior lot to the rear of a reversed corner lot. . . .

"YARD, FRONT—A yard extending across the full width of the lot, the depth of which is the minimum horizontal distance between the front lot line and a line parallel thereto on the lot."

[2]I.e., lots 18 through 23.

[3]Thus the first deed to lot 18 states that "No residence or other building erected on said premises . . . shall be placed nearer than 35 feet to the front boundary line of said premises nor nearer than 4 feet to the side

no suggestion that there were any tract deed restrictions later than those to which the stipulation refers. Accordingly, under the code lot 18 fronts on Lindbrook, it is not a reversed corner lot, and lot 19 is not a key lot. The mathematical computations of the required minimum setback on plaintiffs' lot 20 follow, pursuant to the formula urged by defendant city and by interveners:

The total frontage on Lindbrook of lots 18 through 23 is 554.49 feet, of which 221.8 feet equal 40 percent. The table set forth in the margin[4] shows the frontage of each of the five developed lots and the setbacks of the residences thereon. The combined frontage of lots 18, 19 and 21 totals 314.49 feet or 56.71 percent of the frontage. These three lots are developed with front yards of 35.5 feet, 34.5 feet and 30.5 feet respectively. Thus as specified in the proviso to section 12.08 C.1, quoted above, lots comprising 40 percent or more of the frontage along the Lindbrook block are developed with buildings having front yards with a variation of not more than 10 feet in depth. The average of the front yards of lots 18, 19 and 21 is 33.5 feet, and accordingly the minimum front yard required on plaintiffs' lot 20 is likewise 33.5 feet. This interpretation and application is reasonable and fair and effectuates the clear purpose of the front yard proviso by preserving the aesthetic and economic values established when a substantial number of property owners on a block have built their homes with large front yards to produce a spacious and scenic greenbelt.[5] (See *Gorieb* v. *Fox* (1927) 274 U.S. 603, 609 [71 L.Ed. 1228, 1231, 47 S.Ct. 675, 53 A.L.R. 1210].)

Plaintiffs point out, however, that there are two other combinations of developed lots on the street whose setbacks do not vary more than 10 feet, that each such combination comprises

boundary lines thereof; said residence shall face the *front line of the lot* upon which it is erected, *namely Lindbrook Drive.*'' (Italics added.)

| 4 | Lot No. | Frontage | Setback |
|---|---------|----------|---------|
| | 18 | 144.49' | 35.5' |
| | 19 | 90' | 34.5' |
| | 21 | 80' | 30.5' |
| | 22 | 80' | 46' |
| | 23 | 80' | 46.5' |

[5]Section 12.02 of the city's municipal code in setting forth the purposes of the Comprehensive Zoning Plan, of which the minimum front yard requirements are a part, states in part that the provisions of the plan ''are deemed necessary in order to encourage the most appropriate use of land; to conserve and stabilize the value of property; to provide adequate open spaces for light and air, and to prevent and fight fires; to prevent undue concentration of population; to lessen congestion on streets; . . .''

-more than 40 percent of the frontage, but that a different average setback results from each combination.[6]

From this truism plaintiffs argue that property owners and city administrative officials are left without adequate guidelines in applying the setback regulations, which are thereby rendered unworkable and void for vagueness. The answer is that long before the setback provisions here considered became effective (in 1950) lots comprising more than 40 percent of the frontage of the Lindbrook block had already been developed with buildings having front yards with a variation of not more than 10 feet in depth. Accordingly, upon the effective date of such provisions the minimum setback or front yard requirements for the balance of the frontage became fixed at the average of the front yards of *all* of the described developed lots falling within the terms of the proviso. If upon the effective date of the setback provisions less than 40 percent of the frontage had been so developed, then at such future time as the 40 percent specification is reached the average depth requirement would come into play and would be permanently fixed as a minimum under the terms of the proviso. Put another way, the average depth requirement under the code section is not a variable which may change with each new development on a vacant lot after the 40 percent is reached; instead, once such depth is fixed, it remains as the minimum front yard depth for the other undeveloped lots fronting on the block.[7] Thus no problems of vagueness or unworkable regulations are shown.

■ Plaintiffs next complain that to apply the front yard requirements to their lot is discriminatory and unfair as it denies them ''a privilege of varying the setback that has been granted to all other owners in the block.'' Such an assertion ignores the fact that the development on the other lots occurred before 1938, and that at the respective times thereof either (so far as here shown) the city imposed no minimum setback requirements (lots 22 and 23), or the development complied with the setback requirements which were then applicable (lots 18, 21 and 19).[8] No discrimination or unfairness is shown; instead plaintiffs are attempting to bypass the

---

[6]Thus combining lots 18 and 19 produces an average setback of 35 feet, and combining lots 18 and 21 produces an average setback of 33 feet.

[7]Except key lots, which are controlled by a different provision of the code.

[8]It appears that the building permit for lot 22 issued in 1928, for lot 23 in 1930, for lots 18 and 21 in 1936, and for lot 19 in 1937.

obvious beneficial purposes of the setback minimums by jutting their own construction from 10 to 20 feet closer to the front lot line than that of their neighbors.

What has already been said also answers plaintiffs' contentions that they have been denied due process by subjecting the use of their lot to the control of other private persons who are not subject to any governmental supervision or standards. Under the ordinance involved in *Eubank* v. *City of Richmond* (1912) 226 U.S. 137 [57 L.Ed. 156, 33 S.Ct. 76, 42 L.R.A. N.S. 1123], cited by plaintiffs, there was to be no front yard requirement unless and until other property owners, for whom no guiding standard was provided, petitioned the committee on streets, which was without authority to reject the petition. (See also *Seattle Trust Co.* v. *Roberge* (1928) 278 U.S. 116, 121 [73 L.Ed. 210, 213, 49 S.Ct. 50], in which the ordinance permitted a particular use of property only upon written consent of the owners of two-thirds of the property within 400 feet, for whom no standard of action was provided.) No such situation of "control" by other property owners exists here. Rather, the front yard requirements imposed by defendant city are more akin to those of the ordinance sustained in *Gorieb* v. *Fox* (1927) *supra,* 274 U.S. 603, 604 [71 L.Ed. 1228, 1229], which set a building line "at least as far from the street as that occupied by 60 per cent of the existing houses in the block, . . ."

 There is equally no merit in plaintiffs' contentions that because they commenced work and assertedly incurred liabilities in reliance on the permits as originally issued, they have a vested right to proceed in accordance with such permits. In the first place, the city's stamp of approval which had been placed on *each page* of plaintiffs' plans and specifications before the permits based thereon had been issued, included the warning that "The stamping of this plan and specifications SHALL NOT be held to permit or to be an approval of the violation of any provision of any City Ordinance or State Law."[9]

In the second place section 91.0210(a) of the Los Angeles Municipal Code provides in part that "The plans and specifications shall be of sufficient clarity to indicate the nature and extent of the proposed work and to show in detail that it will conform to the provisions of this Code and of relevant laws,

---

[9]This warning followed the language of section 91.0211(c) of the Los Angeles Municipal Code.

ordinances, rules, regulations and orders.'' Plaintiffs have neither shown nor suggested that their plans disclosed the existing setbacks of the other residences in the Lindbrook block, and in the light of the front yard requirements which the plans violated it is apparent that they did not ''show in detail that [the proposed work] will conform. . . .'' Also, other provisions of the code state that any permit or license issued in violation of such code or of any other city ordinance or which purports to authorize the doing of any act prohibited by the code or other ordinance shall be void (§ 11.02), and shall not constitute approval of any violation of any provision of the code or of any other law or ordinance (§ 91.0202(b)). Thus cases cited by plaintiffs, which dealt with changes in zoning laws after a *valid* permit had been relied upon, are not pertinent here. (See *Griffin* v. *County of Marin* (1958) 157 Cal.App.2d 507, 511-513 [321 P.2d 148] ; *Trans-Oceanic Oil Corp.* v. *Santa Barbara* (1948) 85 Cal.App.2d 776, 791-792 [194 P.2d 148] ; see also *County of San Diego* v. *McClurken* (1951) 37 Cal.2d 683, 691 [9, 10] [234 P.2d 972] ; *Anderson* v. *City Council* (1964) 229 Cal. App.2d 79, 89-90 [40 Cal.Rptr. 41] ; c.f. *West Coast Advertising Co.* v. *City & County of San Francisco* (1967) 256 Cal. App.2d 357 [64 Cal.Rptr. 94].)

■ Contrary to plaintiffs' further contentions, interveners, who own the lot next door to plaintiffs' lot 20 in the Lindbrook block, are parties in interest entitled to intervene in this litigation. (See e.g. *Broadway, Laguna etc. Assn.* v. *Board of Permit Appeals* (1967) 66 Cal.2d 767 [59 Cal.Rptr. 146, 427 P.2d 810] ; *Tustin Heights Assn.* v. *Board of Supervisors* (1959) 170 Cal.App.2d 619, 636 [18] [339 P.2d 914] ; *Hopkins* v. *MacCulloch* (1939) 35 Cal.App.2d 442 [95 P.2d 950], in each of which action to enforce compliance with the zoning laws was maintained by neighboring property owners; see also 8A McQuillin, Municipal Corporations, § 25.351, p. 500.)

As noted, the city's order that plaintiffs provide revised plans included a direction that the height of their front yard retaining wall be reduced. It appears that the municipal code does not permit a retaining wall in excess of 3.5 feet above natural ground level in any required front yard. Accordingly, the minimum front yard depth required under the code will control the height of the retaining wall in that area.

No other contentions appear to require discussion.

The judgment is reversed, and the trial court is directed to enter judgment declaring the rights of the parties in accordance with the views expressed in this opinion.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Sullivan, J., and Peek, J.,* concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.