Filed 11/19/19

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| VAQUERO ENERGY, INC., et al., | F079719 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. BCV-15-101645 ) |
| COUNTY OF KERN et al., | **OPINION** |
| Defendants and Respondents. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Eric Bradshaw, Judge.

Horvitz & Levy, Lisa Perrochet, Robert H. Wright; Hanna and Morton, Edward S. Renwick; and John B. Linford for Petitioners and Appellants.

Margo A. Raison, County Counsel, Andrew C. Thompson, Deputy County Counsel; Holland & Knight, Charles L. Coleman III, Jennifer L. Hernandez and Daniel R. Golub, for Defendants and Respondents.

-ooOoo-

In November 2015, the Board of Supervisors (Board) of the County of Kern[1] approved a new zoning ordinance requiring permits for new oil and gas exploration,

---

[1]    We use the term "County" to refer to the governmental entity and "Kern County" to refer to the geographical area.  (See *County of Kern v. T.C.E.F., Inc.* (2016) 246 Cal.App.4th 301, 306, fn. 1; *County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1557, fn. 1.)

drilling and production. The ordinance imposed a wide range of environmental and other standards on permit applicants. It also adopted two procedural pathways for obtaining permits when the proposed activity would be conducted on split-estate land (i.e., land where the surface rights and the mineral rights are held by different owners) zoned for agriculture. An expedited seven-day pathway is available to permit applicants who obtain the surface owner's written consent to the site plan submitted with the application. In contrast, a more expensive 120-day pathway must be used when the applicant has not obtained the surface owner's signature. One rationale for the Board's adoption of the two pathways was to promote cooperation between the owners of surface rights and the owners of mineral rights.

Plaintiffs Vaquero Energy, Inc. and Hunter Edison Oil Development Limited Partnership (collectively, Vaquero) filed a lawsuit contending the new provisions violated their constitutional rights to equal protection and due process. The trial court rejected the constitutional claims and Vaquero appealed.

Vaquero's due process claim asserts the County inappropriately delegated its permitting authority to private interests—specifically, the owners of surface rights—who can arbitrarily withhold their signatures unless their demands are met. Vaquero contends the two-pathway system gives the owners of surface rights effective control over how mineral right owners use and enjoy their property rights. Vaquero's due process claim requires the interpretation and application of a line of United States Supreme Court cases. (See *Seattle Title Trust Co. v. Roberge* (1928) 278 U.S. 116 (*Roberge*); *Cusack Co. v. City of Chicago* (1917) 242 U.S. 526 (*Cusack*); and *Eubank v. Richmond* (1912) 226 U.S. 137 (*Eubank*).) Despite their age, the meaning of these decisions is far from settled. One commentator stated that "both courts and commentators have struggled to make sense of the doctrine emerging from the *Eubank-Cusack-Roberge* line of cases." (Stahl, *Neighborhood Empowerment and the Future of the City* (2013) 161 U.Pa. L.Rev. 939, 960 (*Stahl*).) More recently, another commentator described the decisions as a

2.

"jurisprudential muddle." (Davidson, *Localist Administrative Law* (2017) 126 Yale L.J. 564, 609, fn. 209.) Based on our interpretation of these cases, we conclude the new ordinance does not violate Vaquero's right to due process because the owner of the surface rights does not have final control over how an owner of mineral rights uses those rights. The final authority over permits is retained by the County.

Vaquero's equal protection claim asserts the two procedural pathways specified in the new zoning ordinance impose disparate treatment on similarly situated permit applicants. Vaquero contends the disparate treatment of permit applicants based on whether they obtained the surface owner's written consent does not further a legitimate governmental purpose. We disagree. Applying the deferential rational basis test, we conclude the board of supervisors rationally could have decided the availability of an expedited seven-day pathway would promote cooperation between owners of mineral rights and owners of surface rights and reduce conflicts, which is a legitimate public purpose.

We therefore affirm the judgment.

## FACTS

### *Prior Regulations*

Title 19 of County's Ordinance Code addresses zoning. In November 2015, County's board of supervisors adopted Ordinance No. G-8605 (Ordinance), which amended Chapter 19.98 to County's Ordinance Code and modified other zoning provisions. Chapter 19.98 contains procedures and standards applicable to the exploration, drilling and production of oil and gas. (Ordinance, § 19.98.010.)

Prior to the adoption of the Ordinance, County's zoning provisions did not require a County permit for drilling on lands zoned for exclusive agriculture, limited agriculture, medium industrial, heavy industrial and natural resource. County did require a permit for drilling in certain residential and commercial districts, though few requests for such conditional use permits were processed. In addition, oil and gas activities were subject to

3.

(1) the County's basic standards for development, building and safety and (2) the permit requirements of state and regional agencies such as the Division of Oil, Gas and Geothermal Resources (DOGGR), the Department of Fish and Wildlife, and the San Joaquin Valley Air Pollution Control District.

*New Regulations*

The Ordinance adopted a "Tier" system to address different land uses and the permitting requirements were tailored to the type of land use within each Tier. Areas where oil and gas operations are the dominant surface land use are designated as "Tier 1." (Ordinance, § 19.98.030(A).) Approximately 10.1 percent of the project area is designated Tier 1 land. The County estimates that Tier 1 lands will contain approximately 90.6 percent (4,400 acres divided by 4,856 acres) of the acreage disturbed annually by oil and gas activities permitted under the Ordinance. "Tier 2" is agricultural land and is distinct from "Tier 3," where neither oil and gas nor agricultural surface activities dominate. (Ordinance, § 19.98.030(B), (C).) "Tier 4" areas are residential, commercial, open space and a few other categories; applicants must obtain a conditional use permit to conduct oil and gas activities on Tier 4 lands. (Ordinance, §§ 19.98.030(D), 19.98.050 [conditional use permit].) "Tier 5" lands include special planning districts or other areas identified in specific plans. The specific plan sets forth the provisions governing oil and gas activities within Tier 5 areas. (Ordinance, § 19.98.030(E).) Oil and gas activities on Tier 4 and 5 lands are rare.

Before an oil and gas activity may occur in any Tier 1, 2 or 3 area, an application for conformity review or minor activity review must be submitted to and approved by County's planning director as consistent with the standards contained in Chapter 19.98. (Ordinance, § 19.98.040(A).) The Ordinance describes the planning director's approval of an application as "ministerial" rather than discretionary. (*Ibid.*)

4.

*Split Estates*

The constitutional issues raised in this appeal challenge how the Ordinance's permitting process applies to land where the surface rights and the mineral rights are held by different owners. Such lands are referred to as "split estate" lands. A significant body of law had developed addressing the relationship between the owner of the surface rights and the owner of the mineral rights and their respective rights and obligations. Generally, the owner of the mineral rights has an implied easement that burdens the surface estate and allows the mineral owner to use the surface as is reasonably required to access the minerals.[2] A California statute provides that if a mineral rights owner intends to enter real property and conduct surface-disturbing activities, such as drilling a new well or constructing structures, the mineral rights owner must provide the owner of the surface rights a minimum of 30 days' notice. (Civ. Code, § 848, subd. (a)(2).) The owner of the surface rights may agree to waive the notice requirement. (Civ. Code, § 848, subd. (c).)

*Two Pathways for Split Estates*

In Tier 1 areas, oil and gas operations are the dominant surface land use and there is less potential for conflict between owners of the surface rights and owners of the mineral rights. Applications for oil and gas activities within Tier 1 areas are subject to conformity review under the procedures set forth in section 19.98.080 of the Ordinance. For instance, the site plan presented with the application must address 12 items listed in section 19.98.080(E) of the Ordinance, including the location of boundary lines, proposed wells, roadways, pipelines, and other structures or facilities. The site plan must

---

[2]    "[T]he owner of the oil and mineral estate has a right to enter upon the surface of the property and make such use thereof as is reasonably required for the enjoyment of his estate." (*Wall v. Shell Oil Co.* (1962) 209 Cal.App.2d 504, 511; see Anderson, *Reasonable Accommodation: Split Estates, Conservation Easements, and Drilling in the Marcellus Shale* (2013) 31 Va. Envtl. L.J. 136, 140 ["mineral estate is the dominant estate and the mineral owner has the implied right to reasonable use of the surface in order to develop the oil and gas"; mineral owner usually has the right to choose both the kind and location of surface uses].)

"[i]dentify the proposed source of water (domestic or production), if applicable."
(Ordinance, § 19.98.080(E)(8).) The County asserts most oil and gas activities on Tier 1
lands will qualify for a seven-day permit process—a process described in greater detail
below.

In comparison, Tier 2, 3 and 5 areas have a greater potential for conflict between
owners of the surface rights and owners of the mineral rights. Applications for oil and
gas activities within these areas are subject to conformity review pursuant to the
procedures stated in section 19.98.085 of the Ordinance. The site plan presented with the
application must address 16 items listed in section 19.98.085(F) of the Ordinance.

Applicants for County oil and gas permits for lands designated as Tier 2, 3 or 5
may obtain permits through one of two pathways. The pathway used depends upon
whether the owner of the surface rights has provided written approval of the site plan.
(Ordinance, §§ 19.98.085(G), 19.98.090 [application with surface owner signature].)
When the applicant has satisfied the conditions specified in the Ordinance, complied with
the applicable notice requirements, and obtained the surface owner's signature on the site
plan, the permit application may be submitted under an expedited seven-day pathway.
(Ordinance, § 19.98.090.) Alternatively, where an applicant is unable to obtain the
surface owner's signature, the only way to obtain a permit is through a 120-day pathway.
(Ordinance, § 19.98.100 [conformity review without surface owner signature].)[3]

The 120-day pathway has three main components, which involve a preapplication
notice, submitting the application for review by the County, and arranging for an
inspector to monitor compliance with mitigation measures and applicable law after the
application has been approved. Prior to submitting an application, the applicant must
provide the surface owner the 30-day notice required by Civil Code section 848 and must

---

[3] County contends that under either pathway, there is no discretionary review by a
County official or board.

6.

include a copy of the proposed site plan along with an offer to meet with the surface owner.  (Ordinance, § 19.98.085(H)(1).)

After the application is submitted to the County, there are two successive 30-day reviews.  First, the application is reviewed for completeness.  The County must inform the applicant on the 30th calendar day of receipt that the application is complete or that additional information is required.  (Ordinance, § 19.98.100(B).)  In addition, the County must inform the surface owner of the option for an in-person meeting with staff of the planning and community development department to discuss the conformity review process and address questions about the proposed site plan.  (Ordinance, § 19.98.100(B).)

During the second 30-day review period, the County schedules a mandatory meeting with the applicant, provides the surface owner time to review any revisions to the proposed site plan, and determines whether "the proposed use meets the implementation standards and conditions specified" in the Ordinance.  (Ordinance, § 19.98.100(C)(5).)  If the County determines the application meets the Ordinance's standards, the permit is issued.  (Ordinance, § 19.98.100(C)(5).)

After issuance of the permit, the applicant must wait an additional 30 days before starting construction.  (Ordinance, § 19.98.100(H).)  The post-issuance "period shall be used to coordinate deposits and inspections pursuant to 19.98.140 (Inspection Compliance)."  (Ordinance, § 19.98.100(H).)  The applicant must contact the planning and community development department and "provide a signed Cost Recovery Agreement, and schedule an inspector to be present during all activities related to the Oil and Gas Conformity Review."  (Ordinance, § 19.98.140.)  The inspector, either from the County or a third-party retained by the County, shall confirm compliance with all requirements of the Ordinance, adopted mitigation measures, and other federal and state laws.  The cost of on-site monitoring is to be paid by the permit applicant.  (Ordinance, § 19.98.140.)

Under the expedited process of the seven-day pathway, the surface owner can waive the initial 30-day preapplication notice requirement. (Ordinance, § 19.98.085(H)(1).) If the surface owner also signs the site plan submitted with the application and affirms the surface owner and the applicant have agreed on the terms contained in the site plan, the permit is to be issued within seven days. (Ordinance § 19.98.085(G), 19.98.090(A), (B).) If the applicant and surface owner reach an agreement during the 120-day pathway, the permit application is processed under the seven-day pathway. (Ordinance § 19.98.100(F).) When a surface owner agrees to the site plan, no post-permit monitoring period is required and, thus, no arrangements need to be made for an inspector. As a result, the activities described in the permit can begin immediately.

## PROCEEDINGS

In December 2015, Vaquero filed a petition for writ of mandate and complaint for declaratory and injunctive relief against the County and three real parties in interest. Vaquero's lawsuit was assigned case No. BCV-15-101645 by the Kern County Superior Court. The real parties in interest were California Independent Petroleum Association, a California nonprofit mutual benefit corporation; Independent Oil Producers' Agency, a California corporation; and Western States Petroleum Association, a California nonprofit mutual benefit corporation (collectively, Oil Associations). The Oil Associations were listed as the proponents of the Ordinance in the environmental review documents prepared for the project.[4]

---

[4]    Oil Associations' stated objectives in proposing the zoning ordinance amendment were to (1) create an effective regulatory and permitting process for oil and gas exploration and production, which could be relied upon by the County, DOGGR and other agencies; (2) achieve an efficient and streamlined environmental review and permitting process for all oil and gas operations covered by the proposed amendment; and (3) develop industry-wide best practices, performance standards, and mitigation measures to ensure adequate protection of public health and safety and the environment. If these efficiencies were attained, Oil Associations believed it would increase oil and gas

8.

Vaquero's operative pleading is a first amended petition and complaint filed in August 2016. It named the County and County's board of supervisors as defendants and omitted the Oil Associations. Vaquero's action challenged the new ordinance provisions as unconstitutional violations of Vaquero's equal protection and due process rights.

Based on a stipulation of the parties, Vaquero's lawsuit was consolidated with two actions alleging the new ordinance provisions were adopted in violation of the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.). The CEQA actions were assigned case Nos. BCV-15-101666 and BCV-15-101679. The consolidation of the three matters achieved several efficiencies for the court and the parties, including the preparation and lodging with the court of a single administrative record.

The trial of the consolidated matters was conducted in June, August and December of 2017. In March 2018, the trial court issued its written ruling resolving all claims and issues. The ruling stated Vaquero had failed to prove the Ordinance was unconstitutional. On April 20, 2018, the court entered a separate judgment in case No. BCV-15-101645, stating Vaquero's claims for relief were denied. That same day, another judgment was entered in the consolidated CEQA actions.

In June 2018, Vaquero filed a notice of appeal. Earlier in the month, the plaintiffs in the CEQA matters filed notices of appeals. The three appeals were assigned case No. F077656 by this court. In August 2019, we bifurcated Vaquero's constitutional claims from the CEQA claims and assigned Vaquero's appeal case No. F079719.

exploration and production in Kern County, which in turn would benefit the local economy.

9.

# DISCUSSION

I.     EQUAL PROTECTION

  A. General Principles

Both the federal and state constitutions include equal protection guarantees.  "No State shall … deny to any person within its jurisdiction the equal protection of the laws." (U.S. Const., 14th Amend., § 1.)  Similarly, article I, section 7, subdivision (a) of the California Constitution provides:  "A person may not be … denied equal protection of the laws .…"  The equal protection clause has been summarized as "essentially a direction that all persons similarly situated should be treated alike." (*Cleburne v. Cleburne Living Center*, *Inc.* (1985) 473 U.S. 432, 439.)  An equal protection claim has two essential elements:

> "'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' [Citation.]" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.)

When a showing has been made that two similarly situated groups are treated disparately, the next element of a meritorious equal protection claim addresses whether the government had a sufficient reason for distinguishing between the two groups.  (*In re Brian J.* (2007) 150 Cal.App.4th 97, 125.)  Different levels of scrutiny exist, but here the parties agree that the rational basis test applies to the question whether the County had a sufficient reason to subject the groups to different treatment.  That test requires a "*rational* relationship between a disparity in treatment and some legitimate government purpose." (*People v. Chatman* (2018) 4 Cal.5th 277, 289.)  Under this test, a statute, regulation or ordinance will be upheld if there is any reasonably conceivable set of facts that provides a rational basis for the classification.  (*FCC v. Beach Communications, Inc.*

10.

(1993) 508 U.S. 307, 313; *People v. Turnage* (2012) 55 Cal.4th 62, 74.)  In *Chatman*, our Supreme Court provided an overview of the rational basis test, stating it

> "sets a high bar before a law is deemed to lack even the minimal rationality necessary for it to survive constitutional scrutiny.  Coupled with a rebuttable presumption that legislation is constitutional, this high bar helps ensure that democratically enacted laws are not invalidated merely based on a court's cursory conclusion that a statute's tradeoffs seem unwise or unfair."  (*Chatman*, *supra*, 4 Cal.5th at p. 289.)

A more detailed explanation of the rational basis test was provided by our

Supreme Court in *Johnson v. Department of Justice* (2015) 60 Cal.4th 871:

> " 'This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve.  Nor must the underlying rationale be empirically substantiated. [Citation.]  While the realities of the subject matter cannot be completely ignored [citation], a court may engage in " 'rational speculation' " as to the justifications for the legislative choice [citation].  It is immaterial for rational basis review "whether or not" any such speculation has "a foundation in the record." ' [Citation.]  To mount a successful rational basis challenge, a party must ' "negative every conceivable basis" ' that might support the disputed statutory disparity.  [Citations.]  If a plausible basis exists for the disparity, courts may not second-guess its ' "wisdom, fairness, or logic." ' [Citations.]"  (*Id*. at p. 881.)

In *Blumenthal v. Board of Medical Examiners* (1962) 57 Cal.2d 228, Justice Traynor described the equal protection test by stating:  "A discrimination, however, that bears no *reasonable relation* to a proper legislative objective is invalid."  (*Id*. at p. 233, italics added.)  We conclude the "reasonable relation" and "rational relationship" are the same test.  In *Blumenthal*, the presumption and burden placed on the party claiming a classification was unconstitutional was described as follows:  " 'When a legislative classification is questioned, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of existence of that state of facts, and the burden of showing arbitrary action rests on the one who assails the classification.'"  (*Ibid*.)  The

11.

evaluation of whether a classification is reasonable or arbitrary considers the difference between the classes and how that difference relates to the object of the regulation. (*Ibid*.)

Here, the parties dispute whether Vaquero overcame the rebuttable presumption of validity and negated every conceivable basis that supports the ordinance's disparate treatment or otherwise established the classification was arbitrary.

B.     Application of Principles

1.     *Similarly Situated Groups Subject to Disparate Treatment*

Vaquero contends the Ordinance creates two groups of split-estate mineral owners. One group consists of mineral owners who have obtained their surface owner's signatures on permit applications. The other group contains mineral owners who have not obtained the surface owner's signatures.

We conclude that Vaquero has demonstrated the two groups of mineral owners are *similarly situated* and the Ordinance subjects the two groups to *disparate treatment* in the form of different pathways. The group with surface owner signatures may proceed under the expedited seven-day pathway. The group without surface owner signatures must proceed under the 120-day pathway. Therefore, Vaquero has established the first element of its equal protection claim—the Ordinance subjects similarly situated groups to disparate treatment.

2.     *Legitimate Public Purpose*

County contends multiple legitimate public purposes support the adoption of the two pathways in Ordinance, including (1) promoting cooperation between oil and gas operators and surface owners, (2) protecting agricultural and other surface land uses from avoidable interference by oil and gas operations, and (3) minimizing land use conflicts. The trial court found the Ordinance's purposes also included "protecting health, safety and the environment."

12.

Vaquero's opening brief acknowledges that these "policies are certainly legitimate public purposes."[5]  However, Vaquero contends the chosen classifications do not rationally advance these public purposes.  Thus, Vaquero's claim of an equal protection violation focuses on the link between the classifications and those public purposes and whether the classifications advance the public purposes.

### 3. Rationality and Promoting Cooperation

We begin by considering whether the two-pathway procedure and the two groups of mineral owners it creates promotes cooperation between oil and gas operators and surface owners.  In our view, promoting cooperation overlaps with minimizing land use conflicts.

First, when an operator qualifies for the seven-day pathway, there exists a strong basis for concluding the operator and the surface owner have cooperated.  Specifically, the qualification for the seven-day pathway requires the operator to submit an application that includes a site plan and the surface owner's signature on a required statement that includes the following:  "The Land/Surface Owner and the Mineral Owner and/or the Operator or Lessee have come to an agreement regarding the use of the surface of the property in connection with the Kern County permit that is being issued with this site plan."  (Ordinance § 19.98.085(F), (G).)  Based on this provision, it is rational to conclude that when an operator qualifies for the seven-day pathway, there has been cooperation—specifically, an agreement about the site plan—between the operator and the surface owner.

Second, we consider the incentives created for cooperating and whether they are rationally related to promoting cooperation.  The incentives for the operator are obvious.  The seven-day pathway is faster and avoids the cost to the operator of inspectors to

---

**5**  Consequently, this opinion does not set forth the historical facts showing the lack of cooperation between oil and gas operators and surface owners was a legitimate concern in Kern County.

monitor compliance. Therefore, the classifications rationally incentivize an operator to attempt to reach an agreement with the surface owner about the specific details contained in the site plan. In comparison, the incentives for the surface owner to cooperate are not as strong, but they appear to exist. A surface owner who successfully negotiates an agreement with the operator will be assured his or her specific concerns are addressed in the agreement with the operator. In contrast, the 120-day pathway may result in a permit that is less favorable to the surface owner on points of special concern to the owner. Although Ordinance section 19.98.100 allows the surface owner to have input at the various stages of review, there is no assurance the surface owner will be satisfied with the way the permit ultimately addresses a particular matter. Consequently, it was rational for the Board to conclude that surface owners have incentives to cooperate with mineral owners in negotiating an approval of a site plan. Because the Board rationally determined the Ordinance would provide incentives to each side, it logically follows that the Ordinance (and the incentives it provides) would promote the legitimate purpose of cooperation between surface owners and mineral owners.

Vaquero disagrees with this analysis of the incentives and the behavior those incentives will promote. Vaquero frames its argument about cooperation as follows: "Punishing a mineral owner financially to the point where he or she has to capitulate does not promote 'cooperation.' Cooperation connotes a mutual give-and-take, and even-handed compromise. The ordinance undermines rather than enhancing even-handedness." To support this argument, Vaquero refers to a statement made by the planning director at the November 9, 2015, Board meeting about the cost of the monitoring or site inspection required by the 120-day pathway. The director stated many oil companies had informed her department "that they may drill for as long as 42 days straight, 24 hours a day." The director stated the monitoring or code compliance officers "could cost half a million dollars for an oil company."

14.

We reject this argument because it is based on a legally incorrect view of how the rational basis test is applied when an enactment is subject to a facial challenge. In *Heller v. Doe* (1993) 509 U.S. 312, the United States Supreme Court stated "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it ' "is not made with mathematical nicety or because in practice it results in some inequality." ' " (*Id*. at p. 321.) Based on these principles, we conclude the incentives created by the Ordinance need not be balanced to create an even playing field between surface owners and oil and gas operators. The rational basis test for equal protection allows some inequality or unevenness in the playing field. Consequently, the fact that the Ordinance appears to provide more bargaining power to surface owners does not support the conclusion that the classifications are not rationally related to promoting cooperation between surface owners and operators. Furthermore, based on the common law principles that establish the mineral owner as the dominant estate, the Board could rationally conclude providing surface owners with more bargaining power offset imbalances that existed under the common law and thereby increased the probability of cooperation between the two owners of rights in split estate lands.

Vaquero restates its argument about cooperation by asserting: "Fostering cooperation among competing commercial interests may be a legitimate governmental goal, through meet-and-confer requirements and the like. But 'cooperation' is not the same as coerced capitulation. The ordinance here goes too far in setting up a significant burden that falls solely on one class of property owners (mineral owners whose surface owners will not sign off on permit applications) to the undue benefit of another class of property owners (the surface owners who wield the power over the permitting process)."

We reject this argument about forced capitulation because it is simply one prediction of what will occur in the future and applicable law does not make Vaquero's prediction binding on the Board or this court. Legislative bodies may make choices

15.

" 'based on rational speculation unsupported by evidence or empirical data.' " (*Heller v. Doe*, *supra*, 509 U.S. at p. 320.) The fact the legislative body's view of how its enactment will operate in the future is subject to dispute is not, without more, sufficient to establish the groups created by the enactment are not rationally related to legitimate governmental purposes. Whether in fact the Ordinance will promote the legislative objectives is not the question because the equal protection clause is satisfied when a court concludes the legislative body rationally could have decided the Ordinance might do so. (*American Bank & Trust Co. v. Community Hospital* (1984) 36 Cal.3d 359, 374.) In short, Vaquero's speculations about what might occur in the future are not sufficient to establish the irrationality of the Ordinance.

Based on the foregoing, we conclude the classifications created by the two pathways provided by the Ordinance are rationally related to promoting cooperation between surface owners and oil and gas operators. As a result, we need not analyze whether the classifications rationally promoted the Ordinance's other legitimate public purposes.

II.    DUE PROCESS

A.    Contentions of the Parties

Vaquero contends the Ordinance violates procedural due process by improperly delegating local government authority over land use permits to surface owners of split-estate lands. The authority delegated relates to whether the applicant for a permit may use the seven-day pathway or must use the 120-day pathway to obtain a permit. In Vaquero's view, the delegation is improper because no constraints or standards were placed on the surface owners and no procedure is provided to oil and gas operators for obtaining relief against surface owners who act arbitrarily or capriciously in refusing to sign a site plan.

16.

In response, County argues the procedural due process claim is meritless because the Ordinance does not give any private party veto power over oil and gas operations and because a private party may agree to waive a zoning regulation intended to protect that private party. Conceptually, County views a surface owner's signature on a site plan as a waiver of the protections contained in the 120-day pathway and not as the power to veto oil and gas activities on the land.

The parties disagree about how to interpret and apply the line of cases decided by the United States Supreme Court addressing the validity of zoning ordinances. (See *Eubank*, *supra*, 226 U.S. 137; *Cusack*, *supra*, 242 U.S. 526; *Roberge*, *supra*, 278 U.S. 116.) Despite the age of these cases, their meaning and application remains unsettled. In 2013, Professor Kenneth Stahl wrote: "Making sense of this trio of cases proves exceedingly difficult." (*Stahl*, *supra*, 161 U.Pa. L.Rev. at p. 960.)

B.     General Legal Principles

1.     *Due Process Clauses*

Both the federal and state constitutions include a due process clause. Section 1 of the Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of … property, without due process of law .…" Article I, section 7, subdivision (a) of the California Constitution states in relevant part: "A person may not be deprived of … property without due process of law .…" These requirements for due process impose a variety of constraints on governmental actions. For example, every governmental deprivation of a person's "property" within the purview of the due process clause requires some form of notice and a hearing. (*Beaudreau v. Superior Court* (1975) 14 Cal.3d 448, 458.) Also, as demonstrated by *Eubank*, *Cusack* and *Roberge*, the requirements of due process act as "a potential limit on the private exercise of regulatory power." (Volokh, *The New Private-Regulation Skepticism: Due Process, Non-Delegation, and Antitrust Challenges* (2014) 37 Harv. J.L. & Pub. Pol'y 931, 933

17.

(*Volokh*) [urging courts to distinguish between due process requirements and non-delegation doctrine].)

>### 2. *United States Supreme Court Cases*

In *Eubank*, the United States Supreme Court evaluated a city ordinance allowing owners of two-thirds of the property abutting a street to determine the setback line beyond which construction would be illegal. (*Eubank*, *supra*, 226 U.S. at pp. 141–142.) Under the ordinance, if owners submitted a written request to the city's committee on streets, the committee was required to establish the setback line, provided it was not " 'less than five feet nor more than thirty feet from the street line.' " (*Id*. at p. 141.) Thus, the ordinance left "no discretion in the committee on streets as to whether the [setback] line shall or shall not be established in a given case." (*Id*. at p. 143.) The court concluded the ordinance violated due process, stating:

> "The action of the committee is determined by two-thirds of the property owners. In other words, part of the property owners fronting on the block determine the extent of use that other owners shall make of their lots, and against the restriction they are impotent.… The statute and ordinance, while conferring the power on some property holders to virtually control and dispose of the proper[ty] rights of others, creates no standard by which the power thus given is to be exercised; in other words, the property holders who desire and have the authority to establish the line may do so solely for their own interest, or even capriciously." (*Id*. at pp. 143–144.)

In *Cusack*, the court examined a municipal ordinance prohibiting the erection of a billboard in any predominantly residential district without the written consent of the owners of a majority of frontage on both sides of the street in the block where the billboard was to be located. (*Cusack*, *supra*, 242 U.S. at pp. 527–528.) The court upheld the ordinance. (*Id*. at p. 531.) The court distinguished *Eubank*, stating the Richmond ordinance left the establishment of the setback line untouched until the lot owners acted and then gave the lot owners' choice the effect of law, making the street committee merely the automatic register of that choice. (*Cusack, supra,* at p. 531.) In contrast, the

ordinance in *Cusack* "absolutely prohibits the erection of any billboards in the blocks designated, but permits this prohibition to be modified with the consent of the persons who are to be most affected by such modification." (*Ibid*.) Thus, one ordinance allowed private parties to impose restrictions on the property of others, while the other allowed private parties "to remove a restriction from other property owners." (*Ibid*.) The court concluded the ordinance in *Cusack* was "not a delegation of legislative power, but is, as we have seen, a familiar provision affecting the enforcement of laws and ordinances." (*Ibid*.)

In *Roberge*, a comprehensive zoning ordinance divided the city into six use districts and designated a " 'First Residence District' " that allowed single-family dwellings, schools, churches, parks and playgrounds, and certain other uses. (*Roberge*, *supra*, 278 U.S. at p. 117.) In 1925, the ordinance was amended as follows: " 'A philanthropic home for children or for old people shall be permitted in First Residence District when the written consent shall have been obtained of the owners of two-thirds of the property within four hundred (400) feet of the proposed building.' " (*Id*. at p. 118.) The court concluded the ordinance was a delegation of power "repugnant to the due process clause." (*Id*. at p. 122.) The court explained this conclusion by stating:

> "The [ordinance] purports to give the owners of less than one-half the land within 400 feet of the proposed building authority—uncontrolled by any standard or rule prescribed by legislative action—to prevent the [permit applicant] from using its land for the proposed home. The superintendent is bound by the decision or inaction of such owners. There is no provision for review under the ordinance; their failure to give consent is final. They are not bound by any official duty, but are free to withhold consent for selfish reasons or arbitrarily and may subject the trustee to their will or caprice." (*Id*. at pp. 121–122.)

The court in *Roberge* distinguished *Cusack* on the ground the facts in *Cusack* were sufficient to show the billboards would or were likely to endanger the safety and decency of the district, while it was "not suggested that the proposed new home for aged poor

19.

would be a nuisance." (*Roberge*, *supra*, 278 U.S. at p. 122.) The court then turned to the facts before it, which included the legislative determination that such group homes were in harmony with the public interest and the general scope and plan of the zoning ordinance, and stated:

> "We find nothing in the record reasonably tending to show that [the proposed home's] construction or maintenance is liable to work any injury, inconvenience or annoyance to the community, the district or any person. The facts shown clearly distinguish the proposed building and use from such billboards or other uses which by reason of their nature are liable to be offensive." (*Roberge*, *supra*, 278 U.S. at p. 122.)

The voting scheme in *Roberge* shares similarities with the scheme in *Cusack*. For this and other reasons, "both courts and commentators have struggled to make sense of the doctrine emerging from the Eubank-Cusack-Roberge line of cases." (*Stahl*, *supra*, 161 U.Pa. L.Rev. at p. 960; see Michelman, *Political Markets and Community Self-Determination: Competing Judicial Models and Local Government Legitimacy* (1977– 1978) 53 Ind. L.J. 145, 164–187.) Professor Volokh analyzed the three cases and stated, "What emerges thus look like a general rule that property owners can't regulate other property owners—with an exception if, as in *Thomas Cusack*, they're actually *deregulating* against the baseline of a general prohibition of a nuisance." (*Volokh*, *supra*, 37 Harv. J.L. & Pub. Pol'y at p. 943.)

Two more United States Supreme Court cases addressing due process and delegation issues are worth noting. In *Carter v. Carter Coal Co.* (1936) 298 U.S. 238, the court examined a statute that "allowed the producers of two thirds of the coal in any 'coal district,' negotiating with unions representing a majority of mine workers, to set wages and hours for all coal producers in the district." (*Volokh*, *supra*, 37 Harv. J.L. & Pub. Pol'y at p. 943.) The court stated the legislation conferred power on private parties "to regulate the affairs of an unwilling minority." (*Carter*, *supra*, at p. 311.) The court concluded the regulation of wages and hours in the production of coal was a

20.

governmental function and a statute conferring this function to private parties, especially in regulating the business of competitors, "undertakes an intolerable and unconstitutional interference with personal liberty and private property." (*Ibid.*) The court characterized the delegation as "clearly arbitrary" and "clearly a denial of rights safeguarded by the due process clause." (*Ibid.*)

Over 40 years later, the United States Supreme Court decided *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.* (1978) 439 U.S. 96 (*New Motor Vehicle Bd.*), which involved a California statute that required car manufacturers to secure the approval of the New Motor Vehicle Board before opening a new dealership when an existing dealership in the marketing area lodged a protest. (*Id*. at p. 98.) The court addressed the argument "that the California scheme constitutes an impermissible delegation of state power to private citizens because the [statute] requires the Board to delay franchise establishments and relocations only when protested by existing franchisees who have unfettered discretion whether or not to protest." (*Id*. at pp. 108-109.) The court rejected the argument, stating: "Almost any system of private or quasi-private law could be subject to the same objection. Court approval of an eviction, for example, becomes necessary only when the tenant protests his eviction, and he alone decides whether he will protest. An otherwise valid regulation is not rendered invalid simply because those whom the regulation is designed to safeguard may elect to forgo its protection. See *Cusack Co. v. Chicago*, 242 U.S. 526 (1917)." (*New Motor Vehicle Bd.*, *supra*, at p. 109.)

### 3. *California Cases*

In April 1958, the Second District considered the relationship between due process, the reasonable exercise of the police power, and the delegation of authority in the context of a section of the Probate Code giving a spouse the right to devise by will one-half of the separate property of the surviving spouse. (*Paley v. Bank of America* (1958) 159 Cal.App.2d 500, 502 (*Paley*).) The court stated:

"There are as many cases in which the court recognizes the principle that, however exercised, even the police power is subject to the constitutional limitation that it may not be exerted arbitrarily or unreasonably. [Citations.] Statutes which operate in a manner to give one person power over the property of another have been declared clearly arbitrary and a denial of due process, the police power notwithstanding (*Carter v. Carter Coal Co.*, 298 U.S. 238 [56 S.Ct. 855, 80 L.Ed. 1160]; *State Board of Dry Cleaners v. Thrift-D-Lux Cleaners*, 40 Cal.2d 436 [254 P.2d 29]; *Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116 [49 S.Ct. 50, 73 L.Ed. 210]; *Eubank v. Richmond*, 226 U.S. 137 [33 S.Ct. 76, 57 L.Ed. 156 42 L.R.A.N.S. 1123]). These cases involved various statutes which delegated the power to curtail or limit rights of ownership in property held by another. In the instant case [the statute], if applied in the manner sought by appellant, delegates the power to take another's property away completely." (*Paley*, *supra*, 159 Cal.App.2d at p. 511.)

Consequently, the court determined the statute was unconstitutional and void if applied to dispose of the surviving spouse's property in the circumstances presented by that case. (*Paley*, *supra*, 159 Cal.App.2d at p. 511.)

In *Weiner v. City of Los Angeles* (1968) 68 Cal.2d 697, the California Supreme Court considered a municipal ordinance that established the front yard requirements for undeveloped lots based on the average of the depth of front yards of developed lots along the frontage. The owners of an unimproved lot were attempting to build a residence on their lot. They contended an order by the superintendent of building stopping their proposed construction violated "due process by subjecting the use of their lot to the control of other private persons who are not subject to any governmental supervision or standards." (*Id*. at p. 705.) The court stated the ordinance involved in *Eubank* had "no front yard requirement unless and until other property owners, for whom no guiding standard was provided, petitioned the committee on streets, which was without authority to reject the petition." (*Weiner, supra,* at p. 705.) In contrast, the court described the ordinance in *Roberge* as permitting "a particular use of property only upon written consent of the owners of two-thirds of the property within 400 feet, for whom no standard of action was provided." (*Weiner, supra,* at p. 705.) The court distinguished *Eubank* and

*Roberge* from the municipal ordinance in question because the ordinance itself set forth the formula for determining the front yard requirement and did not provide for control by other property owners. (*Weiner, supra,* at p. 705.) As to control, the ordinance did not make the consent or objections of neighborhood property owners a factor in approving proposed construction. As a result, the court rejected the due process claim. (*Ibid.*)

The foregoing California cases are not directly on point with the facts of the present appeal. They demonstrate, however, that California is not among the states, like Texas, that have interpreted their state constitutions as containing "vibrant non-delegation doctrines that not only are stricter than the federal one but also strongly distinguish between public and private delegates." (*Volokh*, *supra*, 37 Harv. J.L. & Pub. Pol'y at p. 933.) Consequently, we conclude the federal and state due process clauses provide the same level of protection.

C.     Application of Precedent

Based on our review of the California cases, the *Eubank-Cusack-Roberge* trilogy, and the subsequent decisions of the United States Supreme Court, we conclude the most important factors in analyzing the constitutionality of a land use ordinance that transfers some authority to private property owners are (1) the amount and type of control transferred, (2) whether the private property owners' action or inaction produces results that are binding on the other property owner, and (3) the presence or absence of standards dictating how that control must be exercised.

Here, the parties agree that the surface owners are not subject to any standards when they decide whether or not to sign a site plan. Thus, they "are free to withhold consent for selfish reasons or arbitrarily." (*Roberge*, *supra*, 278 U.S. at p. 122.) That factor, by itself, is not determinative. If it were, the billboard ordinance in *Cusack* would not have been upheld. Therefore, we conclude the resolution of Vaquero's due process claim turns on the amount and type of control given to surface owners under the

23.

Ordinance and whether "their failure to give consent is final." (*Roberge*, *supra*, 278 U.S. at p. 122.)

### 1. Finality of Control Over Land Use

Here, the Ordinance authorizes surface owners to give their written approval to a site plan, which allows the oil and gas operator to qualify for the seven-day pathway and avoid the 120-day pathway. This control over which pathway applies—a procedural question—is qualitatively different from allowing surface owners to "determine the extent of use that other owners shall make of their [property rights.]" (*Eubank*, *supra*, 226 U.S. at p. 143.) For instance, when a surface owner does not agree to a site plan, the details of how an oil and gas operator will conduct its operations on the land in question have not been determined. Instead, the details of the operations will be resolved by the County when it decides the permit application complies with applicable law and issues the permit. Thus, the type of control given to private parties by the Ordinance does not allow private parties to control how the owners of mineral rights use and enjoy those rights. Instead, the control given determines the procedural mechanism by which the owner of mineral rights obtains a permit. Thus, the type and amount of control given to private parties by the Ordinance distinguish it from the ordinances considered in *Eubank*, *Cusack* and *Roberge*.

In addition, the fact County ultimately decides whether the site plan proposed by the applicant complies with applicable law, including the mitigation measures, and is eligible for approval, demonstrates the surface owner's failure to agree to a site plan is not a final, binding decision with respect to how the land is used. This factor distinguishes the Ordinance from the ordinances invalidated in *Eubank* and *Roberge*.

Consequently, we conclude the Ordinance does not violate due process because the County's delegation of some control to the surface owners does not give them the final authority to determine how the oil and gas operator will use its mineral rights.

Stated another way, the Ordinance avoids the due process problem of enabling surface owners "to force an alteration in the legal regime without any discretion remaining in government and without any protection against their personal biases." (*Volokh*, *supra*, 37 Harv. J.L. & Pub. Pol'y at p. 946.) Here, the County retains the authority to issue a permit under the 120-day pathway, which provides permit applicants some protection against the personal biases of surface owners.

### 2. *Coercive Power and Exploitation*

Vaquero contends the Ordinance gives surface owners the power to withhold their signatures and exploit monetary compensation from the permit applicant. If the permit applicant does not pay the asking price, the applicant is forced to (1) delay the proposed oil and gas activity for an additional 90 days[6] and (2) incur significant monitoring or inspection costs. Vaquero refers to the planning director's statement to the Board that the cost of onsite inspection could reach $500,000.

The County argues the burden of delay and additional expense does not render the Ordinance unconstitutional because it could have enacted only the 120-day pathway (without the alternative provided by the seven-day pathway) and the burdens of delay and expense would have been upheld. In addition, the County relies on *New Motor Vehicle Bd.*, *supra*, 439 U.S. 96 and argues the delay imposed on applicants who have not obtained surface owner signatures is not an unconstitutional burden. In that case, the United States Supreme Court stated: "The narrow question before us, then, is whether California may, by rule or statute, temporarily delay the establishment or relocation of automobile dealerships pending the Board's adjudication of the protests of existing dealers." (*Id*. at p. 106.) The court upheld the statute. The County argues the temporary

---

[6]     A mineral rights holder is required by Civil Code section 848 to give 30 days' notice to the surface owner unless the surface owner agrees to waive the notice requirement. Consequently, the incremental delay attributable to the Ordinance's 120-day pathway is 90 days.

delay occasioned by the 120-day pathway is similar to the delay associated with the regulatory agency's adjudication of a protest made by an existing car dealer to the opening of a new dealership.

Based on *New Motor Vehicle Bd.*, *supra*, 439 U.S. 96, we agree the incremental delay experienced by completing the 120-day pathway is not such an onerous burden that it offends the due process clause by delegating too much power to a private party. As the delay is temporary, it does not involve an exercise of final control by the owner of surface rights, and is rationally related to the goal of cooperation because it provides additional time for the parties to reach an agreement.

Vaquero's challenges to the additional costs imposed by the 120-day pathway are not as easily resolved, primarily because that burden is difficult to quantify. In contrast, the delay was calculated simply by subtracting the statutory notice period of 30 days from the 120 days required by the longer pathway. The additional costs were addressed during oral argument by counsel for the County, who argued the planning director's statement about costs of $500,000 was hyperbole and a more reasonable estimate would be $50,000.[7] The parties' arguments about the costs of monitoring raise questions of fact about what will happen in the future. Those questions of fact include, without limitation, what the cost of monitoring might be for an applicant, whether surface owners will demand payment in exchange for their signatures, what amounts would be demanded, and what amounts would be paid.

As a court of review evaluating a facial challenge to the Ordinance, we are not well situated to make findings to resolve these questions. As a general rule, legislative findings are given great weight by the judiciary and will be upheld unless the reviewing court determines the findings are unreasonable and arbitrary. (*Amwest Surety Ins. Co. v.*

---

[7]     Counsel arrived at this estimate by multiplying 42 days times 24 hours per day time $50.00 per hour, which equals $50,400.

*Wilson* (1995) 11 Cal.4th 1243, 1252.) Lacking information about the actual impact of the Ordinance on the relationship between the owners of surface rights and the owners of mineral interests, we defer to the implied findings of the legislative body and conclude the monetary burden imposed is not unreasonable or arbitrary.[8]

In summary, we join the trial court in rejecting Vaquero's claims that the Ordinance violated the constitutional protections provided by the equal protection clause or the due process clause.

### DISPOSITION

The judgment entered in case No. BCV-15-101645 on April 20, 2018, is affirmed. Respondents shall recover their costs on appeal to the extent that the costs relate to case No. BCV-15-101645 and do not overlap with the costs incurred in case Nos. BCV-15-101666 and BCV-15-101679. (Cal. Rules of Court, rule 8.278.)

_____
FRANSON, Acting P. J.

WE CONCUR:


_____
PEÑA, J.


_____
SNAUFFER, J.

---

[8] Our resolution of Vaquero's facial challenges should not be interpreted as expressing any opinion on the merits of any "as applied" challenge based on due process or equal protection grounds.